IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Elbert R. Jenkins, | ) | C/A No.: 1:20-cv-2544-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Cameron McGowan Currie, United States District Judge, dated September 11, 2020, referring this matter for disposition. [ECF No. 11]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 10].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons

that follow, the court remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On April 20, 2015, Plaintiff protectively filed an application for DIB in which he alleged his disability began on September 1, 2014. Tr. at 161, 313–21. His application was denied initially and upon reconsideration. Tr. at 195–98, 200–03. On July 28, 2017, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson. Tr. at 73–109 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 22, 2017. Tr. at 162–86. The Appeals Council granted Plaintiff's request for review, vacated the hearing decision, and remanded the case to the ALJ to obtain additional testimony from a vocational expert ("VE") as to whether Plaintiff had transferable skills from his past relevant work ("PRW"), resolve any conflicts between the VE's testimony and the *Dictionary of Occupational Titles* ("*DOT*"), evaluate degenerative disc disease ("DDD") of the lumbar spine in accordance with Social Security Ruling ("SSR") 15-1(4), and give further consideration to and specifically refer to evidence of record in support of the assessed residual functional capacity ("RFC"). Tr. at 187–91. Plaintiff had a second hearing before the ALJ on July 30, 2019. Tr. at 41–72. The ALJ issued a second unfavorable decision on January 6, 2020, finding that Plaintiff was not

disabled within the meaning of the Act. Tr. at 12–40. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 8, 2020. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 55 years old at the time of the first hearing and 57 years old at the time of the second hearing. Tr. at 53, 80. He completed high school. *Id.* His PRW was as a delivery driver and an automobile salesperson. Tr. at 66. He alleges he has been unable to engage in substantial gainful work activity since September 1, 2014. Tr. at 313.

#### 2.    Medical History[1]

Plaintiff underwent polysomnogram on January 31, 2007, that showed severe obstructive sleep apnea ("OSA") with moderate desaturation and severe snoring. Tr. at 1123–24.

Plaintiff was admitted to St. Francis Hospital after presenting with dyspnea and exertional chest pain on September 29, 2011. Tr. at 485. A left

---

[1] The record contains evidence prior to Plaintiff's alleged onset date. The undersigned declines to summarize all of these records, but has noted the most significant procedures and findings.

heart catheterization showed multivessel coronary artery disease ("CAD"). Tr. at 485, 508–09. Timothy H. Williams, M.D., performed three-vessel coronary artery bypass grafting ("CABG") on September 30, 2011. Tr. at 553.

Plaintiff presented to Greenville Memorial Hospital ("GMH"), for chest pain and unstable angina on November 27, 2011. Tr. at 765. He underwent angioplasty and stenting to the native proximal right coronary artery ("RCA") and was released on November 29, 2011. *Id.*

On June 6, 2012, Plaintiff was hospitalized at GMH for laparoscopic redo Nissen fundoplication with mesh hepatobiliary iminodiacetic acid ("HIDA") plasty. Tr. at 1046–47. He had previously undergone laparoscopic Nissen fundoplication in 2000 and had reported good results until one year prior, when he began to experience severe epigastric dysphagia and reflux. Tr. at 1048.

On June 11, 2013, Timothy M. Zgleszewski, M.D. ("Dr. Zgleszewski"), evaluated Plaintiff for left knee pain following an on-the-job injury. Tr. at 2347. He assessed aggravation of pre-existing osteoarthritis and left patellar tendinosis/tendinitis. Tr. at 2384. He considered Plaintiff to be at maximum medical improvement and assessed a 12% impairment rating to his left lower extremity. Tr. at 2348–49. He stated Plaintiff could return to light duty, lifting up to 20 pounds occasionally and should not "perform continuous walking or standing that exceeds 50% of work time, crawl, kneel, or be in a

cramped position, squat repetitively, or do work that requires frequent or repeated stair climbing." Tr. at 2349.

On June 2, 2014, Plaintiff presented to the emergency room ("ER") at GMH for chest pain. Tr. at 1246. He indicated he had taken four Nitroglycerin tablets, but felt no relief. *Id.* Daniel McManus, M.D. ("Dr. McManus"), assessed non-specific chest pain and discharged Plaintiff with instruction to follow up with his cardiologist the following day. Tr. at 1251.

Plaintiff again presented to the ER at GMH on June 18, 2014, for back pain and swelling. Tr. at 1228. He stated he had reported to work, but was unable to complete the workday because of his pain. *Id.* X-rays of Plaintiff's lumbar spine showed mild dextroscoliosis and marginal osteophyte formation. Tr. at 1231. Valda L. Smith, M.D., noted midline and paraspinal tenderness and negative straight-leg raising ("SLR") test. Tr. at 1236–37. She assessed a lumbar strain and degenerative joint disease of the spine, prescribed Norco, Prednisone, and Valium, and instructed Plaintiff to follow up with his primary care physician ("PCP"). Tr. at 1233, 1237.

Plaintiff followed up with orthopedic surgeon Dwight Jacobus, D.O. ("Dr. Jacobus"), for the fifth in a series of Hyalgan injections to his left knee on August 5, 2014.[2] Tr. at 1412.

---

[2] Plaintiff treated with Dr. Jacobus for left knee pain beginning in 2011. *See* Tr. at 2350–55.

On August 21, 2014, Plaintiff presented to the ER at St. Francis Downtown with lower and right-sided back pain. Tr. at 1133. Dawn L. Zellner, M.D. ("Dr. Zellner"), observed positive SLR, no lumbar spine tenderness, and right lower lumbar tenderness to palpation ("TTP"). Tr. at 1135. She assessed a back strain and instructed Plaintiff to follow up with his PCP. *Id.*

Plaintiff followed up with Richard A. Banks, M.D. ("Dr. Banks"), for hyperlipidemia, type II diabetes, and back pain on August 21, 2014. Tr. at 1307. He endorsed anxiety and back and muscle pain. Tr. at 1308. Dr. Banks noted normal findings on physical exam, aside from mild TTP of the lumbar spine and right flank. Tr. at 1308–09. He assessed uncontrolled type II diabetes, anxiety, mixed hyperlipidemia, depression, lower back pain, and vitamin D deficiency. Tr. at 1309. He prescribed Fenofibrate for hyperlipidemia, indicated he would refer Plaintiff for psychiatric treatment, prescribed vitamin D3 2000 units for vitamin D deficiency, and provided samples of Duexis and prescribed Cyclobenzaprine HCL 10 mg for lower back pain. *Id.*

Plaintiff presented to the ER at GMH with right lower back pain on August 30, 2014. Tr. at 1176. His blood pressure was elevated at 190/120 mmHg. *Id.* Sarah Fabiano, M.D. ("Dr. Fabiano"), observed Plaintiff to have midline tenderness in the lower back, paraspinal tenderness in the right

lower back, pain with positive SLR on the right at 30 degrees, and 2+ patellar reflexes bilaterally. Tr. at 1178. X-rays of Plaintiff's lumbar spine showed thoracolumbar scoliosis and spondylosis, with no definite acute bony pathology. Tr. at 1174. Dr. Fabiano prescribed Norco 7.5 mg and Zofran and administered Norflex and Solumedrol injections. Tr. at 1178–79. She discharged Plaintiff with a Medrol Dosepak and Robaxin and instructed him to follow up with Dr. Jacobus. Tr. at 1179–81.

On September 14, 2014, Plaintiff complained of bilateral upper and lower back pain. Tr. at 1407. He noted some improvement as to his knee following Hyalgan injections. Tr. at 1407, 1409. He described difficulty getting up and down and moving about. Tr. at 1409. Dr. Jacobus observed S1 radicular change on the left side. *Id.* He assessed lumbago and lumbosacral radiculitis, recommended magnetic resonance imaging ("MRI") of the lumbar spine, and prescribed Norco 7.5-325 mg. Tr. at 1408, 1409.

Plaintiff presented to the ER at GMH with chest pain that radiated to his left shoulder and arm on September 26, 2014. Tr. at 1164. Joshua Stanton, M.D. ("Dr. Stanton"), assessed non-specific chest pain and discharged Plaintiff. Tr. at 1169–70.

On October 17, 2014, Plaintiff reported sharp, aching pain in his bilateral lower back and left knee. Tr. at 1403. He reported he was

attempting to save money for an MRI, as he was self-pay. Tr. at 1405. Dr. Jacobus refilled Norco 7.5-325 mg. Tr. at 1404.

Plaintiff complained of high blood pressure and associated headache on November 3, 2014. Tr. at 1304. His blood pressure was elevated at 158/98 mmHg. Tr. at 1305. Dr. Banks noted normal findings on physical exam. Tr. at 1305. He restarted Plaintiff on Lisinopril 10 mg for hypertension and Fenofibrate for hyperlipidemia and continued Cyclobenzaprine HCl 10 mg for lower back pain and Zolpidem Tartrate 10 mg for insomnia. Tr. at 1306.

On November 18, 2014, Plaintiff presented for hypertension follow up and reported a mild headache. Tr. at 1300. His blood pressure was elevated at 136/96 mmHg. Tr. at 1301. Dr. Banks noted normal findings on physical exam. Tr. at 1301–02. He increased Lisinopril to 30 mg to address Plaintiff's elevated blood pressure. Tr. at 1302.

Plaintiff followed up with Dr. Banks for hypertension and chronic lumbar pain on December 3, 2014. Tr. at 1297. He indicated his lumbar pain was poorly controlled, despite his compliance with treatment and noted he was saving money for an MRI of the lumbar spine. *Id.* His blood pressure was elevated at 152/90 mmHg. Tr. at 1298. Dr. Banks noted normal findings on physical exam, aside from moderate TTP of the lumbar spine and right flank. Tr. at 1298–99. He prescribed Norco 7.5-325 mg for lower back pain and Coreg 12.5 mg for hypertension. Tr. at 1299.

Plaintiff presented to GMH with chest pain and nausea on December 20, 2014. Tr. at 1213. Dr. McManus observed epigastric tenderness. Tr. at 1214. He diagnosed mild acute pancreatitis. *Id.*

Plaintiff followed up with Dr. Banks for hypertension and chronic lumbar pain on January 5, 2015. Tr. at 1294. He reported compliance with treatment, but noted his lumbar spine symptoms were not controlled. *Id.* He indicated he had stopped taking Lisinopril because it caused a cough that resolved after he stopped taking it. *Id.* Plaintiff weighed 206 pounds and his blood pressure was elevated at 142/90 mmHg. Tr. at 1295. Dr. Banks noted moderate TTP of the lumbar spine. Tr. at 1296. He restarted Plaintiff on Norco 7.5-325 mg for lower back pain and prescribed Losartan 100 mg for hypertension. *Id.*

On January 27, 2015, Plaintiff rated his back pain as a four with medication and an eight without. Tr. at 1398. He described sharp, aching, and stabbing pain in his bilateral lower back. *Id.* Dr. Jacobus noted Plaintiff was "getting up and down and moving about" and was "still working." Tr. at 1400. He observed Plaintiff to forward flex to about 80 degrees, to side-bend to 20 degrees, and to have L5 radicular-type change. *Id.* He prescribed Norco 7.5-325 mg and instructed Plaintiff to follow up after his MRI. Tr. at 1399, 1400.

On January 28, 2015, an MRI of Plaintiff's lumbar spine and lower thoracic spine was unremarkable without evidence of disc herniation or spinal stenosis at any level. Tr. at 1437.

On February 20, 2015, Plaintiff reported dull, aching bilateral lower back and left knee pain. Tr. at 1394. Dr. Jacobus noted myospasm in Plaintiff's lumbar region with forward flexion to 80 degrees and radicular changes along L5. Tr. at 1395. He reviewed Plaintiff's MRI results, noting unremarkable lumbosacral findings, and an MRI of his knees that showed some degenerative changes and post-operative aspects from his acromioclavicular ligament ("ACL") surgery. *Id.* He stated Plaintiff was "doing okay" overall and working and prescribed Norco 10-325 mg. Tr. at 1394, 1395.

Plaintiff presented to Jeffrey Nations, M.D. ("Dr. Nations"), to establish care on March 12, 2015. Tr. at 1451. He reported a history of diabetes, hypertension, hyperlipidemia, gastroesophageal reflux disease ("GERD"), and three-vessel CABG. *Id.* He admitted to smoking a pack of cigarettes per day. *Id.* He said his GERD was controlled following Nissen fundoplication and anxiety and depression were well-controlled with medication. *Id.* Plaintiff's blood pressure was elevated at 140/92 mmHg. Tr. at 1452. He was 69 inches tall and weighed 202 pounds. Tr. at 1453. Dr. Nations noted normal findings on physical exam. *Id.* He refilled Plaintiff's medications, ordered lab studies,

encouraged Plaintiff to stop smoking, and instructed him to follow up in three months. *Id.*

On March 20, 2015, Plaintiff endorsed arthralgias/joint pain and back pain. Tr. at 1388. Dr. Jacobus refilled Norco 10-325 mg. *Id.*

Plaintiff followed up with Dr. Jacobus for lumbar and left knee pain on May 15, 2015. Tr. at 1382. He reported muscle aches, arthralgias/joint pain, and back pain. Tr. at 1385. He indicated he was working part-time and attempting flexion exercises. *Id.* He rated his pain as an eight prior to taking medication and a three after taking medication. *Id.* Dr. Jacobus refilled Norco 10-325 mg with instruction for Plaintiff to take it every eight hours. *Id.*

Plaintiff presented to the ER at Baptist Easley Hospital ("BEH") for weakness and leg cramping on May 17, 2015. Tr. at 1360. He reported that he had spent the day outside at "the drag strip" and had prolonged heat exposure. *Id.* Robert M. Hellams, M.D. ("Dr. Hellams"), assessed heat exhaustion, heat cramps, and syncope and instructed Plaintiff to follow up with his PCP within two to four days. Tr. at 1363.

Plaintiff followed up with Brittany Pirko, NP ("NP Pirko"), on May 22, 2015. Tr. at 1462. He reported feeling weak and fatigued. *Id.* NP Pirko recorded normal findings on physical exam. Tr. at 1464. She assessed dehydration symptoms and ordered lab studies. *Id.*

Plaintiff reported feeling lightheaded and having no energy on June 11, 2015. Tr. at 1504. Frederick Douglas, M.D., recorded normal findings on physical exam. Tr. at 1508–09. He indicated Plaintiff's lab studies did not suggest continuing dehydration. Tr. at 1510. He recommended Plaintiff take a little more time off from work. *Id.*

Plaintiff presented to the ER at BEH on June 13, 2015, for lower abdominal pain with intermittent diarrhea and nausea. Tr. at 1472. Karen Ardis, M.D. ("Dr. Ardis"), noted moderate tenderness and guarding in Plaintiff's bilateral lower abdominal quadrants. Tr. at 1474. She ordered lab studies and an abdominal computed tomography ("CT") scan that were normal. Tr. at 1476. She referred Plaintiff to Vijendra Singh, M.D. ("Dr. Singh"), for further consultation. *Id.* Dr. Singh opined that Plaintiff's symptoms could be related to diverticulosis or early diverticulitis. Tr. at 1480. He noted Plaintiff's symptoms had improved following administration of intravenous fluids, Zofran, and Dilaudid and that he had a normal white blood cell count and an unremarkable CT scan of the abdomen. *Id.* He felt that Plaintiff could be released with prescriptions for Cipro, Flagyl, Zofran, and Oxycodone. Tr. at 1480.

Plaintiff returned to the ER at BEH with worsened abdominal symptoms on June 16, 2015. Tr. at 1484. John V. Holeman, M.D., indicated Plaintiff's lab studies and vital signs were "very reassuring" and he needed a

colonoscopy. Tr. at 1487. He ordered Morphine 2 mg and discharged Plaintiff to follow up with Dr. Nations on the following day. *Id.*

Plaintiff followed up with Dr. Nations on June 17, 2015. Tr. at 1516. He reported diarrhea, decreased appetite, and not feeling well, but denied severe abdominal pain. *Id.* Dr. Nations observed mild tenderness in the mid-abdomen and left lower quadrant ("LLQ"). Tr. at 1518. He provided refills, instructed Plaintiff to continue Cipro and Flagyl, and prescribed Omeprazole for probable gastritis and duodenitis. *Id.* He also encouraged Plaintiff to stop smoking and to stay hydrated. *Id.*

On June 26, 2015, Dr. Nations completed a mental status form at the request of the state agency. Tr. at 1500. He indicated he last treated Plaintiff on June 17, 2015. *Id.* He stated Plaintiff had been diagnosed with depression with anxiety for which he had prescribed Lexapro and Diazepam. *Id.* He noted Plaintiff was oriented to time, person, place, and situation and had intact thought process, appropriate thought content, normal mood/affect and good attention/concentration, and memory. *Id.* He described Plaintiff as having good abilities to complete basic activities of daily living ("ADLs"), relate to others, complete simple and routine tasks, and complete complex tasks. *Id.* He stated Plaintiff could manage his funds. *Id.*

Plaintiff returned to the ER at BEH with LLQ abdominal pain and diarrhea on July 1, 2015. Tr. at 1691. He indicated his symptoms had

returned following completion of two rounds of Cipro and Flagyl. *Id.* A CT scan of Plaintiff's abdomen and pelvis showed no acute diverticulitis. Tr. at 1696. Kimberly G. Kyker, M.D. ("Dr. Kyker"), discharged Plaintiff with instruction to follow up with Dr. LaBelle with Gastroenterology Associates. Tr. at 1695.

Plaintiff presented to Bruce A. Kofoed, Ph.D. ("Dr. Kofoed"), for a consultative psychological evaluation on July 13, 2015. Tr. at 1526. He reported a history of heart disease with cardiac stent and three-vessel bypass, diverticulosis and significant stomach problems, diabetes, hypertension, and orthopedic problems involving his knees, back, and shoulder. *Id.* He said he continued to work delivering pizzas for 10 to 15 hours per week. Tr. at 1527. He said he had recently been less involved in activities he had formerly enjoyed like playing golf with friends and watching football, but continued to show good social interaction skills. *Id.* He said he could visit restaurants, the grocery store, and Wal-Mart and enjoyed reading and listening to music. *Id.* He indicated he would walk in his neighborhood for about 30 minutes at a time. *Id.* Dr. Kofoed observed Plaintiff to be neatly dressed and groomed with good hygiene and a tidy appearance. *Id.* He noted Plaintiff was friendly and cooperative, smiled frequently, joked, and laughed. *Id.* Plaintiff endorsed good sleep with use of Ambien. Tr. at 1527–28. Dr. Kofoed noted Plaintiff demonstrated good effort on cognition tasks, was

oriented in all spheres, named each of the last four presidents, performed serial seven subtractions without error, recalled four words after a brief delay, copied three of four geometric shapes in their entirety, and recalled one of four shapes with omission of several details. Tr. at 1528. He stated Plaintiff showed good interpersonal abilities and was capable of doing simple repetitive tasks from a cognitive perspective. *Id.* His diagnostic impression was depressive disorder associated with his general medical condition. Tr. at 1529. He considered Plaintiff to be capable of independently managing his funds. *Id.*

On July 17, 2015, Plaintiff reported aching pain in his bilateral lumbar spine and left knee. Tr. at 2002. Dr. Jacobus noted +2 patellar, Achilles, and plantar reflexes, forward flexion to 80 degrees, back and bilateral side bend to 20 degrees, and equal extensor hallucis longus ("EHL") muscle strength. Tr. at 2003. He continued Norco 10-325 mg, as Plaintiff had reported 80% pain relief and had no aberrant behavior. *Id.*

On July 23, 2015, state agency psychological consultant Silvie Kendall, Ph.D. ("Dr. Kendall"), reviewed the record, considered listings 12.04 for affective disorders and 12.06 for anxiety-related disorders, and assessed no repeated episodes of decompensation and mild restriction ADLs, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Tr. at 132–34. She concluded Plaintiff's

symptoms and impairments imposed minimal limitations on his ability to perform basic work-related tasks/functions. Tr. at 133.

Plaintiff presented to the ER at BEH with diarrhea, nausea, and abdominal pain on August 9, 2015. Tr. at 1699. He described the pain as located in the LLQ of his abdomen and rated it as a 10. *Id.* Dr. Ardis observed Plaintiff to be in mild distress, grimacing, and in the fetal position during exam. Tr. at 1701. She noted mild LLQ tenderness. *Id.* A CT scan showed severe sigmoid diverticulosis with no diverticulitis. Tr. at 1703. Dr. Ardis prescribed Cipro and Flagyl and advised Plaintiff to follow a high fiber diet and to follow up with his PCP within two weeks. *Id.*

Plaintiff followed up with Dr. Nations on August 11, 2015. Tr. at 1786. Dr. Nations noted Plaintiff's weight, blood pressure, and blood sugar were stable. *Id.* Plaintiff reported some improvement, although he admitted to having a lot of LLQ abdominal pain the prior day. *Id.* He complained of feeling angrier and more stressed. *Id.* Dr. Nations noted mild tenderness in the right upper quadrant and more pronounced tenderness in the LLQ of Plaintiff's abdomen. Tr. at 1788. He diagnosed diverticulitis and depressive disorder, refilled Plaintiff's medications, continued his antibiotics for an additional week, discontinued Lexapro, prescribed Sertraline, and instructed Plaintiff to continue to monitor his blood sugar and to follow up in two months. *Id.*

Plaintiff returned to the ER at BEH with abdominal pain on August 16, 2015. Tr. at 1707. John E. Milko, M.D. ("Dr. Milko"), observed moderate LLQ tenderness on physical exam. Tr. at 1708. He stated Plaintiff's lab work and x-rays were unremarkable and discharged him. Tr. at 1709.

Plaintiff presented to the ER at GMH with abdominal pain on August 18, 2015. Tr. at 1533. He reported a two-week history of left flank pain with recent worsening of diarrhea and vomiting. *Id.* He stated Oxycodone was not relieving his pain. *Id.* Joshua Gray, M.D. ("Dr. Gray"), observed Plaintiff to appear mildly anxious and to have diffuse TTP that was worse in the LLQ with questionable rebound and no guarding. Tr. at 1534. He noted a CT scan showed no acute pathology. Tr. at 1535. He ordered lab studies and intravenous administration of Dilaudid, Zofran, and Sodium Chloride. Tr. at 1536. He discharged Plaintiff with prescriptions for Oxycodone and Zofran. Tr. at 1537.

On August 23, 2015, state agency medical consultant Dina Nabors, M.D. ("Dr. Nabors"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; six for about six hours in an eight-hour workday; frequently climb ramps/stairs; never climb ladders/ropes/scaffolds; occasionally stoop, kneel, crouch, and crawl; and avoid concentrated exposure to extreme cold, extreme

heat, wetness, humidity, and hazards. Tr. at 135–37. A second state agency medical consultant, William Crosby, M.D. ("Dr. Crosby"), assessed the same physical RFC on September 17, 2015. *Compare* Tr. at 135–37, *with* Tr. at 154–56.

Also on September 17, 2015, state agency psychological consultant Xanthia Harkness, Ph.D. ("Dr. Harkness"), reviewed the record, considered Listings 12.04 and 12.06, and assessed no repeated episodes of decompensation and mild restriction of ADLs, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Tr. at 151–53.

Plaintiff endorsed bilateral lumbar and left knee pain on September 22, 2015. Tr. at 1996. Dr. Jacobus noted +2 patellar, Achilles, and plantar reflexes, forward flexion to 80 degrees, back and bilateral side bending to 20 degrees, equal EHL muscles, and patellofemoral crepitus. Tr. at 1997. He indicated Plaintiff had no aberrant behavior and reported 80% pain relief with medication. Tr. at 1998. He continued Norco 10-325 mg and indicated Plaintiff was thinking of undergoing repeat Hyalgan injection the following month. *Id.*

Plaintiff presented to Dr. Nations for routine follow up on October 12, 2015. Tr. at 1795. He indicated he had experienced no further episodes of diverticulitis since August. *Id.* He stated he had cut back on smoking and

planned to quit later that week. *Id.* Dr. Nations noted normal findings on physical exam. Tr. at 1797. He diagnosed hypertension, diabetes, CAD, GERD without esophagitis, mixed hyperlipidemia, and acute bronchitis. *Id.* He prescribed Hycodan cough syrup, encouraged smoking cessation, and instructed Plaintiff to monitor and record his blood sugar and to follow up in two months. Tr. at 1798.

Plaintiff was admitted to BEH for observation on November 8, 2015, after presenting with severe abdominal pain and multiple incidents of nausea, vomiting, and diarrhea. Tr. at 1714. He admitted that he continued to smoke a pack of cigarettes per day, despite his cardiac history. *Id.* He received intravenous fluids, Protonix, and Carafate and slowly improved. *Id.* Ami B. Patel, M.D., discharged Plaintiff on November 10, 2015, with instruction to follow up at Gastroenterology Associates for further endoscopic evaluation. *Id.*

On November 20, 2015, Plaintiff reported dull left knee pain and low back pain that interfered with sleep and work. Tr. at 1992. Dr. Jacobus noted normal reflexes, no effusion, negative drawer and McMurray tests, forward flexion to 80 degrees, bilateral side and back bending to 20 degrees, knee range of motion ("ROM") from zero to 140 degrees, and patellofemoral crepitus. Tr. at 1993. He indicated Plaintiff "continue[d] to work everyday"

and his medications were working well without side effects. *Id.* He refilled Norco 10-325 mg. *Id.*

Plaintiff complained that Sertraline was not helping and was causing him to be angrier and more easily irritated on December 3, 2015. Tr. at 1811. Dr. Nations noted Plaintiff's blood pressure was borderline elevated at 144/90 mmHg. Tr. at 1811, 1813. He assessed major depressive disorder ("MDD"), CAD, and GERD without esophagitis, replaced Sertraline with Mirtazapine for depression, and continued Plaintiff's other medications. Tr. at 1813.

On January 19, 2016, Plaintiff reported he had not tolerated Mirtazapine because of vivid dreams, but had improved with Venlafaxine. Tr. at 1815. His blood pressure, weight, and GERD were under good control and he denied recent episodes of diverticulitis. *Id.* He complained of chronic back and bilateral knee pain and said he could not continue pain management treatment with Dr. Jacobus, as the practice no longer accepted his insurance. *Id.* Dr. Nations noted some TTP in the midline lower lumbar area. Tr. at 1817. He assessed MDD, insomnia, low back pain, and bilateral knee pain. *Id.* He refilled Plaintiff's medications, including Norco, and instructed him to follow up in three months. Tr. at 1817–18.

Plaintiff presented to the ER at GMH with complaints of chest pain and possible unstable angina on March 4, 2016. Tr. at 1607. An electrocardiogram ("EKG") was unchanged and Plaintiff's troponin level was

initially normal. Tr. at 1608. Cardiac catheterization showed stable anatomy. *Id.* Ned D. Freeman, M.D., discharged Plaintiff with diagnoses of noncardiac chest pain, CAD, history of CABG, GERD, chronic back pain, anxiety, diabetes, and hyperlipidemia. Tr. at 1607–08. He instructed Plaintiff to follow up in his office and with a gastroenterologist. Tr. at 1609.

Plaintiff presented to Barbara A. Moran-Faile, M.D. ("Dr. Moran-Faile"), for cardiology follow up on March 8, 2016. Tr. at 1549. His blood pressure was normal and he weighed 189 pounds. Tr. at 1552. Dr. Moran-Faile recorded normal findings on physical exam. *Id.* She described Plaintiff's CAD as stable with patent grafts. Tr. at 1553. She recommended Plaintiff continue his current medications, engage in moderate physical activity for at least 30 minutes on six days per week, and follow a diet rich in whole grains, fruits, and vegetables. *Id.*

Plaintiff presented to Anjani Jammula, M.D. ("Dr. Jammula"), for evaluation of abdominal pain and dysphagia on March 29, 2016. Tr. at 1893. He complained of dysphagia that had started six month prior, generally occurred once a week, and had worsened over the prior few months. *Id.* He endorsed generalized abdominal pain and nausea after eating. *Id.* Plaintiff's blood pressure was elevated at 151/97 mmHg. Tr. at 1896. Dr. Jammula recorded normal findings on physical exam. Tr. at 1896–97. He ordered an

esophagogastroduodenoscopy ("EGD"), esophageal manometry, and a gastric emptying study. Tr. at 1897–98.

Plaintiff presented to the ER at GMH for abdominal pain on April 15, 2016. Tr. at 1658. He complained of chronic, daily abdominal pain and stated his pain had become so severe that he could not stand it. *Id.* Edward Robeson Tinsley, M.D. ("Dr. Tinsley"), noted Plaintiff was in moderate distress due to pain, demonstrated tachycardia, and had diffuse abdominal tenderness with significant tenderness to the periumbilical region and bilateral lower quadrants. Tr. at 1659–60. A CT scan showed no significant findings, and Dr. Tinsley indicated Plaintiff's pain was likely secondary to reflux or ulcers. Tr. at 1660. He discharged Plaintiff to follow up with a gastroenterologist within a week. *Id.*

Plaintiff presented to Dr. Nations for routine follow up on April 25, 2016. Tr. at 1823. His blood pressure and weight were stable. *Id.* He reported improved depression and indicated his fasting glucose ranged from 110 to 130. *Id.* He noted he was working part-time as a pizza delivery driver and continued to smoke half a pack of cigarettes per day. *Id.* Dr. Nations recorded normal findings on physical exam. Tr. at 1825–26.

On May 4, 2016, Plaintiff endorsed dysphagia to solids and liquids that had begun six months prior, occurred once a week, and had worsened over the prior months. Tr. at 1558. He reported generalized abdominal pain after

eating. *Id.* Dr. Jammula recorded normal findings on physical exam. Tr. at 1562. He ordered an EGD and a gastric emptying study. Tr. at 1563.

On May 8, 2016, Plaintiff visited the ER at BEH with generalized abdominal pain that radiated to his back. Tr. at 1733. Kenneth Campbell, M.D. ("Dr. Campbell"), observed Plaintiff to be in moderate distress and to demonstrate mild, generalized abdominal tenderness and minimal guarding. Tr. at 1734–35. A CT scan of Plaintiff's abdomen showed no obstruction and mildly dilated small bowel loops. Tr. at 1736. Dr. Campbell assessed diabetic gastroparesis and discharged Plaintiff with a prescription for Reglan 10 mg and instruction to follow up with Dr. Nations and his gastroenterologist. *Id.*

Plaintiff presented to the ER at BEH with lower back and right flank pain on June 14, 2016. Tr. at 1743. Dr. Milko noted some mild right costovertebral angle ("CVA") tenderness. Tr. at 1744–45. He indicated Plaintiff endorsed some pain on SLR test and opined that his symptoms were likely related to musculoskeletal back pain. Tr. at 1746.

On July 7, 2016, Plaintiff presented to the ER at BEH with a three-day history of abdominal pain and diarrhea. Tr. at 1748. Dr. Kyker noted Plaintiff was in mild distress and had bilateral flank tenderness. Tr. at 1750. She diagnosed diverticulitis, abdominal pain, and possible opioid withdrawal syndrome and prescribed Flagyl 500 mg, Cipro 500 mg, and Tramadol 50 mg. Tr. at 1752.

Plaintiff presented to Kathleen Elizabeth Tarpy, PA ("PA Tarpy"), with complaints of abdominal pain and dysphagia on July 13, 2016. Tr. at 1909. He complained of weakness, nausea, and diarrhea that occurred three to four times a day. Tr. at 1910. PA Tarpy noted Dr. Jammula had performed an EGD that showed mild chronic gastritis and manometry that indicated ineffective esophageal motility. *Id.* She stated Plaintiff was taking Erythromycin 250 mg twice a day to treat gastritis and ineffective esophageal motility. *Id.* She indicated a recent CT scan of Plaintiff's abdomen and pelvis suggested herniation at the level of Plaintiff's prior esophageal surgery. *Id.* She referred Plaintiff to a general surgeon for evaluation of the herniation, prescribed Carafate, and continued Erythromycin and Zofran. Tr. at 1915.

On July 28, 2016, Plaintiff's blood pressure was stable, his weight was reduced by a few pounds, and his fasting blood glucose was about 130 mg/dL. Tr. at 1956. He endorsed improved depression and worsened anxiety and panic attacks and feeling angry and easily irritated. *Id.* He admitted he was smoking a pack of cigarettes a day. *Id.* Dr. Nations noted normal findings on physical exam. Tr. at 1858–59. He refilled Plaintiff's medications, adjusting his doses of Venlafaxine and Diazepam, and encouraged Plaintiff to monitor and log his blood sugar and stop smoking. Tr. at 1959.

On August 2, 2016, Plaintiff presented to Dane Edward Smith, M.D. ("Dr. Smith"), for recurrent gastrointestinal symptoms. Tr. at 1836. Dr.

Smith noted Plaintiff had undergone an initial Nissen fundoplication around 2000 and a redo Nissen with mesh repair in 2012. *Id.* Plaintiff reported having initially done well following the redo Nissen and having not required proton pump inhibitors ("PPIs") for over a year thereafter. *Id.* However, he indicated he subsequently developed abdominal symptoms and was restarted on PPIs. *Id.* He said he underwent workup that showed very poor esophageal motility and very poor gastric emptying. *Id.* He endorsed difficulty swallowing, globus sensation, and occasional severe epigastric pain. *Id.* Dr. Smith reviewed a recent CT scan that "ma[de] it look as though his wrap [was] herniated above his diaphragm." *Id.* Plaintiff's blood pressure was elevated at 142/88 mmHg. Tr. at 1839. Dr. Smith stated it was unclear how much of Plaintiff's symptomatology was related to motility issues, as opposed to the herniation of his Nissen wrap. *Id.* He ordered a barium swallow to determine whether the wrap had become obstructive. *Id.* He stated that, if it were obstructive, a takedown of the wrap might be required. *Id.* However, he was not optimistic that he could keep Plaintiff's hiatal hernia fixed, as it had already recurred twice. *Id.*

On August 12, 2016, Dr. Smith explained that the barium study had shown poor esophageal motility and an early portion diverticulum. Tr. at 1845. He noted it showed apparent relative obstruction at the gastroesophageal junction at the location of the Nissen fundoplication wrap.

*Id.* He felt that Plaintiff had progressively poorer esophageal peristalsis to the point where his Nissen had become a significant obstruction to his swallowing. *Id.* He recommended converting the Nissen to a partial wrap to improve Plaintiff's swallowing, but conveyed that the procedure would not improve the motility or problems with gastric vessels and might worsen his reflux. *Id.* He scheduled Plaintiff for laparoscopic takedown of his Nissen fundoplication. *Id.*

Dr. Smith performed laporoscopic partial takedown of Plaintiff's Nissen fundoplication on August 17, 2016. Tr. at 2082. Plaintiff tolerated the procedure well. *Id.* He was admitted to GMH for an overnight stay, tolerated fluids well, and was discharged the following day with instruction to follow a soft diet. *Id.*

Plaintiff reported some soreness along the left subcostal trocar site on September 6, 2016. Tr. at 1850. He indicated he was mainly consuming liquids and soft foods and had noticed a bit of improvement. *Id.* His blood pressure was elevated at 148/93 mmHg. *Id.* Dr. Smith observed soft trocar sites were healing well and noted Plaintiff had some subjective tenderness along the left subcostal trocar site. *Id.* He prescribed Oxycodone 5 mg and indicated Plaintiff should continue to improve as his edema and inflammation resolved. *Id.*

On September 21, 2016, Plaintiff reported his dysphagia had improved and he was adjusting to his gastroparesis lifestyle and continuing to take Erythromycin twice a day. Tr. at 1928. PA Tarpy noted normal findings on physical exam. Tr. at 1932. She continued Plaintiff's treatment pending his follow up with Dr. Smith, but indicated she planned to decrease his PPI to once a day and have him "tak[e] a drug holiday from Erythromycin" after Dr. Smith released him. Tr. at 1933. Plaintiff expressed a desire to consult a dietician, and PA Tarpy provided contact information. *Id.*

On October 11, 2016, Plaintiff reported he was swallowing much better, but continued to have problems with postprandial bloating due to gastroparesis. Tr. at 1856. Dr. Smith indicated Plaintiff should follow up in six months. *Id.*

On November 1, 2016, Plaintiff reported improved swallowing, depression, and anxiety with fewer panic attacks. Tr. at 1966. He indicated his fasting blood sugars ranged from 130 to 140 and he was smoking a pack of cigarettes a week. *Id.* His blood pressure was stable and he had gained a few pounds. *Id.* Dr. Nations noted mildly tender maxillary sinuses and serous fluid in both tympanic membranes, but otherwise normal exam findings. Tr. at 1969. He assessed acute sinusitis, in addition to Plaintiff's chronic impairments. *Id.*

Plaintiff and his wife presented to Dr. Nations for a routine follow up visit on November 15, 2016. Tr. at 1961. Plaintiff's blood pressure and weight were stable. *Id.* His wife reported that he was "not wanting to leave the house" and would become angry when he was required to do so. *Id.* They indicated Plaintiff was "helping to care for his mother," which presented a "stressful situation" and was depressed because his severe back pain prevented him from working. *Id.* Dr. Nations noted normal findings on physical exam. Tr. at 1964. He increased Venlafaxine to 100 mg twice a day and Valium to 5 mg three times a day. Tr. at 1965.

On November 21, 2016, Plaintiff denied problems with dysphagia and reflux, but reported difficulty moving his bowels. Tr. at 1944. He described six to seven bowel movements a day that required straining and resulted in small, hard stool. *Id.* He denied having followed up with the dietician and endorsed increased depression and anxiety because his ongoing gastroparesis had prevented him from returning to work. *Id.* Plaintiff's blood pressure was elevated at 142/96 mmHg. Tr. at 1949. PA Tarpy recorded normal findings on physical exam. *Id.* She prescribed Naloxegol 25 mg for chronic constipation. *Id.*

Plaintiff reported stable back pain, better control of reflux, and smoking one pack of cigarettes per week on February 7, 2017. Tr. at 1972. Dr. Nations noted Plaintiff's blood pressure was borderline elevated at 140/98

mmHg and he had gained a few pounds, weighing 196.3 pounds. Tr. at 1972, 1975–76. He refilled Plaintiff's medications. Tr. at 1976.

The following day, Dr. Nations completed a physician questionnaire. Tr. at 1984–87. He stated he had treated Plaintiff every three months since March 2015 for chronic back pain, arthritis, anxiety, and depression. Tr. at 1984. He described Plaintiff's conditions as stable, but noted they could deteriorate over time. *Id.* He noted Plaintiff's symptoms included daily pain in his low back and knee pain and anxiety on most day. *Id.* He indicated Plaintiff experienced severe pain in his low back and knees that was constant and always present, but helped by rest and Norco. *Id.* He stated clinical findings and objective signs of Plaintiff's impairments included TTP in the muscles adjacent to the lumbar spine and pain along the joint lines of both knees. *Id.* He indicated he prescribed Norco as needed for pain, which could cause drowsiness and nausea and Diazepam as needed for nausea, which could cause drowsiness. *Id.* He confirmed that Plaintiff's impairments had lasted at least 12 months. *Id.* He admitted that emotional factors, including depression and anxiety, contributed to the severity of Plaintiff's symptoms and functional limitations. *Id.* He stated Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations he described. *Id.* He noted Plaintiff's experience of pain or other symptoms was occasionally severe enough to interfere with attention and concentration

needed to perform even simple work tasks. Tr. at 1985. He considered Plaintiff incapable of even "low stress" jobs. *Id.* He estimated Plaintiff could walk two city blocks without rest or severe pain, sit for 15 minutes at one time, stand for 15 minutes at one time, sit for less than two hours in an eight-hour workday, and stand for less than two hours in an eight-hour workday. *Id.* He indicated Plaintiff would need to include periods of walking around for four to five minutes every 15 to 20 minutes in an eight-hour workday. *Id.* He stated Plaintiff would need a job that permitted shifting positions at will from sitting, standing, or walking and would need to take unscheduled breaks for five minutes at a time, once or twice each hour. Tr. at 1986. He noted Plaintiff could occasionally lift less than 10 pounds and rarely lift 10 pounds. *Id.* He indicated Plaintiff could occasionally look down (sustained flexion of neck), turn his head to the right or left, look up, and hold his head in a static position. *Id.* He stated Plaintiff could never twist, stoop (bend), crouch/squat, climb ladders, or climb stairs. *Id.* He estimated Plaintiff would be absent from work on more than four days per month because of his impairments or treatment. Tr. at 1987. Dr. Nations completed a second questionnaire concerning Plaintiff's impairments on June 18, 2019, reiterating the same opinions. *Compare* Tr. at 2367–70, *with* Tr. at 1984–87.

On February 27, 2017, Plaintiff reported doing well overall and having stopped Erythromycin, as he felt that his gastroparesis was mostly controlled

with low fiber and small portions. Tr. at 2158. He indicated he was taking Omeprazole once daily and denied problems with reflux and dysphagia. *Id.* He had gained five pounds and reported he was moving his bowels regularly without requiring Naloxegol. *Id.* Plaintiff endorsed some postprandial abdominal pain and was unable to identify any particular triggers. Tr. at 2159. He said he had to lie down and relax and that the pain would eventually subside on its own. *Id.* Plaintiff's blood pressure was elevated at 145/97 mmHg. Tr. at 2163. PA Tarpy noted normal findings on physical exam. *Id.* She instructed Plaintiff to continue to take a PPI for reflux and indicated they could revisit Erythromycin if Plaintiff felt his gastroparesis was not doing well. Tr. at 2164. She ordered a mesenteric artery duplex ultrasound to rule out intestinal ischemia and offered Levsin for pain, but Plaintiff declined it pending results of the ultrasound. *Id.*

Plaintiff was admitted to GMH on March 14, 2017, after presenting to the ER with atypical chest pain and acute dyspnea. Tr. at 2171. He reported a dry, non-productive cough, feeling sore all over, shooting pain with any movement, and a one-month history of near-syncopal episodes in which he felt as if his blood pressure were "bottom[ing] out" after he walked from one room to another. *Id.* His creatinine was abnormal on admission; he received intravenous fluids; and his creatinine subsequently returned to normal. *Id.* Chest x-rays and a CT angiogram were normal. Tr. a 2172. Charles Cole,

D.O. ("Dr. Cole"), discharged Plaintiff on March 17, 2017, with diagnoses of atypical chest pain and likely viral upper respiratory infection ("URI"). Tr. at 2171.

Plaintiff followed up with Dr. Nations on March 20, 2017. Tr. at 2004. His wife reported that Plaintiff had been confused since his discharge from the hospital. *Id.* Plaintiff continued to have productive cough and some discomfort across his upper abdomen. *Id.* Dr. Nations noted mild discomfort to palpation in Plaintiff's upper abdomen, but otherwise normal findings on physical exam. Tr. at 2008. He assessed dehydration, acute kidney injury, and bronchitis with bronchospasm. *Id.* He refilled Plaintiff's medications, but instructed Plaintiff to hold off on taking Losartan and Metformin pending a two-week follow up visit. *Id.*

Plaintiff was again admitted to GMH on March 22, 2017. Tr. at 2280. He reported progressive pleuritic chest pain, night sweats, cough, fatigue, fevers, chills, nausea, and poor intake by mouth. Tr. at 2282. He described a "terrible cough" that was associated with increasing shortness of breath and diffuse chest pain. *Id.* He was hypoxic in the ER and required up to four liters of oxygen. *Id.* Chest x-rays revealed multiple rib fractures. *Id.* Plaintiff improved on a medication regimen that included Norco, Hycodan, Omnicef, and intravenous Toradol. *Id.* He was weaned from oxygen one day after admission. Tr. at 2283. Dr. Cole discharged Plaintiff on March 24, 2017, with

diagnoses of URI and multiple broken ribs and prescriptions for Norco, Hycodan, and Omnicef. Tr. at 2282.

Plaintiff returned to the ER at GMH with a persistent cough and sharp pain on March 30, 2017. Tr. at 2558. Dr. Gray observed TTP in the chest. Tr. at 2562. He ordered a Lidoderm patch and Hycodan, and Plaintiff improved. Tr. at 2563. He diagnosed closed fracture of multiple ribs on both sides and bronchitis and discharged Plaintiff with a prescription for Lidoderm 5% patches. Tr. at 2564.

Plaintiff returned to the ER at GMH with severe right chest/flank pain on April 8, 2017. Tr. at 2574. He denied coughing and injury with the exception of having sneezed on the prior day. *Id.* Chest x-rays showed acute rib fractures with mild displacement of the right fourth, fifth, sixth, and seventh ribs and old bilateral fractures. *Id.* Plaintiff was admitted for pain control. *Id.* He initially required Morphine, but was subsequently able to be maintained on Norco 10 mg every four hours. *Id.* Joshua B. Elder, M.D., discharged Plaintiff on April 10, 2017, with a prescription for Norco and instruction to complete 24-hour urine cortisol collection and to bring the sample to the lab for testing. *Id.* He continued vitamin D supplementation and ordered a bone density scan. *Id.*

Plaintiff followed up with Dr. Nations on April 17, 2017. Tr. at 2418. His blood pressure was stable and he had lost a few pounds. *Id.* He

complained of significant pain due to rib fractures. *Id.* Dr. Nations noted some TTP in the right lateral chest wall. Tr. at 2421. He titrated Plaintiff's Norco dose and added Tramadol to address his pain. Tr. at 2422.

Plaintiff returned to the ER at GMH on April 20, 2017. Tr. at 2600. He complained of rib pain after having sneezed during the night. Tr. at 2602. Katelyn J. Craigo, NP, observed tenderness and bony tenderness in Plaintiff's chest. Tr. at 2605. She indicated Plaintiff's presentation was consistent with the known rib fractures and discharged him to follow up with his PCP. *Id.*

On April 28, 2017, Plaintiff presented to the ER at GMH with pain in his chest, lateral ribs, and under his shoulder blades. Tr. at 2612. His blood pressure was elevated at 166/97 mmHg. Tr. at 2612. Paul William Cartwright, M.D. ("Dr. Cartwright"), noted TTP in the right posterolateral eighth rib and left subscapularis muscle. Tr. at 2613. Chest x-rays showed a displaced left posterior eighth thoracic rib fracture. Tr. at 2615. Dr. Cartwright assessed a new closed fracture at the right eighth rib and discharged Plaintiff with a prescription for Percocet and instruction to follow up with his PCP. Tr. at 2613.

On May 3, 2017, a bone density scan showed decreased bone mineral density within the lumbar spine and both proximal femurs. Tr. at 2618.

Plaintiff presented to the ER at GMH on May 6, 2017, after having slipped on the carpet and hit the right side of his chest on the sofa. Tr. at

2621. He complained of pain to the anterior right side of his chest. *Id.* His blood pressure was elevated at 173/106 mmHg. Tr. at 2622. Wyman William Cabaniss, M.D., noted chest tenderness on physical exam. Tr. at 2623. He noted no new rib fractures on x-ray, ordered a Dilaudid injection, and discharged Plaintiff with instruction to continue Percocet as needed. Tr. at 2624.

On May 12, 2017, Plaintiff complained of rib pain and noted back pain and reflux were stable. Tr. at 2412. Dr. Nations noted Plaintiff's blood pressure was borderline high and he had gained a few pounds. *Id.* He stated a recent scan had shown decreased bone density in Plaintiff's hips and lumbar area. *Id.* He continued Plaintiff's medications, encouraged smoking cessation, and instructed him to continue to monitor his blood sugar. Tr. at 2416.

Plaintiff presented to the ER at GMH on June 6, 2017, after having felt a pop in the right side of his chest after having sat down forcefully in his bed. Tr. at 2629. His blood pressure was elevated at 155/90 mmHg. *Id.* Timothy Bradshaw Depp, M.D. ("Dr. Depp"), noted focal tenderness in Plaintiff's right chest wall. Tr. at 2630. Chest x-rays showed acute mildly displaced fractures of Plaintiff's right lateral sixth and seventh ribs. Tr. at 2631. Dr. Depp assessed multiple closed rib fractures and discharged Plaintiff to follow up with his PCP within two to three days and to take Norco for pain. Tr. at 2632.

Plaintiff complained of rib pain on July 13, 2017. Tr. at 2407. He noted marked discomfort upon coughing. *Id.* Dr. Nations indicated Plaintiff's weight and blood pressure were stable. *Id.* He stated a recent bone density scan had confirmed a diagnosis of osteopenia. *Id.* He noted Plaintiff's pulse was elevated and he had some TTP in the right lateral chest wall. Tr. at 2410–11. He prescribed a tapering dose of Medrol for anti-inflammatory effect. Tr. at 2411.

On August 16, 2017, Plaintiff reported having stopped smoking and endorsed improved rib pain and stable back pain and reflux. Tr. at 2401. Dr. Nations noted borderline blood pressure at 142/92 mmHg. Tr. at 2401, 2405. He continued Plaintiff's medication and encouraged him to refrain from smoking. Tr. at 2405.

Plaintiff presented to the ER at GMH for chest pain and cough with shortness of breath on November 12, 2017. Tr. at 2639. His pulse and blood pressure were elevated. Tr. at 2641. Emily Lynn Hirsh, M.D. ("Dr. Hirsh"), noted diminished breath sounds bilaterally, tachycardia, and "exquisite" right-sided chest wall tenderness. Tr. at 2641. She diagnosed bronchitis versus early pneumonia and suspected rib fractures, prescribed antibiotics, and discharged Plaintiff to follow up with his PCP. Tr. at 2644–45.

Plaintiff followed up with Dr. Nations for acute bronchitis and chest wall pain on November 15, 2017. Tr. at 2396. Dr. Nations noted Plaintiff's

blood pressure was borderline high. *Id.* He observed TTP along the sternum right lateral chest wall, and left lateral and posterior chest wall. Tr. at 2400. He changed Doxycycline to Bactrim DS and administered a Depo-Medrol 40 mg injection. *Id.*

Plaintiff's weight, blood pressure, back pain, and reflux were stable on November 17, 2017. Tr. at 2390. He continued to recover from an episode of bronchitis and his chest wall pain was improving. *Id.* He indicated he had stopped smoking. *Id.* He denied checking his blood sugar on a regular basis. *Id.* Dr. Nations noted some TTP in the paraspinous muscles adjacent to the lumbar spine. Tr. at 2394. He refilled Plaintiff's medications, counseled him on diet and exercise, and encouraged him to continue with smoking cessation and to monitor and record his blood sugar readings. *Id.*

Plaintiff was admitted to GMH on December 12, 2017, after having presented to the ER with chest pain and shortness of breath. Tr. at 2654. He reported having taken 325 mg of aspirin and four nitroglycerin pills without relief. *Id.* EKG changes were unremarkable and Troponin was negative. *Id.* Plaintiff also complained of intermittent abdominal pain and demonstrated some mild tenderness on exam. *Id.* His blood pressure was elevated at 151/101 mmHg and his pulse was 104 beats per minute ("BPM"). Tr. at 2670. A nuclear stress test showed a moderate, reversible defect of mild severity in the basal inferior and mid inferior locations. Tr. at 2676. A cardiac

catheterization showed severe native vessel CAD, three patent grafts with some distal disease, and normal left ventricular systolic function. Tr. at 2686. Joseph Houston Henderson, M.D., indicated Plaintiff's medical therapy required augmentation. *Id.* Christopher William Schaefer, M.D., discharged Plaintiff on December 14, 2017, after having increased Coreg to 25 mg twice a day, doubled Omeprazole, and instructed Plaintiff to follow up with his gastroenterologist within one to two weeks. Tr. at 2654.

Plaintiff again presented to the ER at GMH with chest pain on December 30, 2017. Tr. at 2690. He described sharp left-sided chest pain that radiated to his left shoulder and the left side of his back. *Id.* He noted he had been coughing a lot due to a sinus infection and had chest soreness. *Id.* Amy Coppler Ramsay, M.D. ("Dr. Ramsay"), noted chest tenderness and diminished sounds in the base of Plaintiff's left lung. Tr. at 2692. She indicated an EKG was normal, Troponin was negative, and a CT scan of Plaintiff's chest showed no rib fractures or evidence of pneumonia. Tr. at 2693. Dr. Ramsay assessed pleuritic or chest wall pain and prescribed a short course of Norco. *Id.*

Plaintiff returned to Dr. Jammula for follow up and evaluation of chest pain January 2, 2018. Tr. at 2710. He described right-sided chest pain that occurred daily after eating, sometimes lasted for hours, and generally could not be alleviated. *Id.* He indicated he was taking Omeprazole 40 mg daily

38

with controlled reflux and Erythromycin 250 mg twice a day with intermittent drug holidays. *Id.* Dr. Jammula recorded normal findings on physical exam. Tr. at 2714–15. He scheduled Plaintiff for an EGD, prescribed Carafate 1 gm tablet, and instructed Plaintiff to take Erythromycin 30 minutes prior to lunch and dinner. Tr. at 2716.

Dr. Jammula performed EGD on the following day. Tr. at 2724–25. He noted reflux esophagitis manifesting as mucosal edema and hypertrophy. Tr. at 2725. He stated nothing on the EGD explained Plaintiff's retrosternal chest discomfort. *Id.* He continued Plaintiff's medications, including the addition of Carafate, instructed Plaintiff to start an anti-reflux diet, to raise the head of his bed by four to six inches, and to avoid smoking, excess caffeinated beverages, garments fitting tightly to the abdomen, and eating before bed. *Id.*

Plaintiff presented to cardiologist Jeffrey Michael Dendy, M.D. ("Dr. Dendy"), at Carolina Cardiology Consultants ("CCC") on January 12, 2018. Tr. at 3050–51. He endorsed chest discomfort, shortness of breath, and fatigue. Tr. at 3051. Dr Dendy noted normal findings on physical exam. Tr. at 3053–54. He assessed CAD, hypertension, and dyslipidemia and added Imdur to Plaintiff's medication regimen to address chest discomfort. Tr. at 3055.

On March 5, 2018, Plaintiff's blood pressure, weight, back pain, and reflux were stable and his fasting blood sugars were in the 130s. Tr. at 2384.

He indicated he was not smoking. *Id.* He reported feeling a little lightheaded upon standing. *Id.* Dr. Nations noted some TTP in the paraspinous muscles adjacent to the lumbar spine. Tr. at 2387. He refilled medications and encouraged Plaintiff to continue smoking cessation, diet, exercise, and blood sugar monitoring. Tr. at 2388.

Plaintiff followed up with Dr. Dendy on April 9, 2018. Tr. at 3067. His blood pressure was elevated at 152/95 mmHg. Tr. at 3069. Dr. Dendy noted normal findings on physical exam. Tr. at 3069–70. He indicated Plaintiff's impairments were clinically stable and continued the same regimen. Tr. at 3070.

Plaintiff presented to the ER at GHM following a syncopal episode on April 13, 2018. Tr. at 2729. He also endorsed chest pain, diarrhea, nausea, back pain, neck pain, dizziness, and weakness. Tr. at 2732. Ronald Gerard Pirrallo, M.D. ("Dr. Pirrallo"), noted paraspinous TTP, but otherwise normal findings on exam. Tr. at 2732–33. He ordered intravenous hydration, as emergency medical services ("EMS") reported Plaintiff's blood pressure was initially orthostatic. Tr. at 2734. A urinalysis was negative, and Dr. Pirrallo discharged Plaintiff with impressions of syncope, hypotension, and renal insufficiency. *Id.*

Plaintiff returned to Dr. Jammula for evaluation of lower abdominal pain and diarrhea on April 25, 2018. Tr. at 2755. He indicated it started one-

to-two months prior and was initially occurring intermittently, but had more recently occurred daily, with two to three episodes of diarrhea and lower abdominal pain after every meal. *Id.* His weight was stable. *Id.* Dr. Jammula noted distension and generalized abdominal tenderness on exam. Tr. at 2761. He ordered multiple lab studies and requested Plaintiff collect stool samples. Tr. at 2763. He indicated Plaintiff had normocytic anemia and might benefit from a referral to a hematologist. *Id.* He stated gastroparesis was stable on Erythromycin and GERD was stable on a PPI. *Id.* He performed a colonoscopy that showed a polyp in the sigmoid colon and moderately severe diverticulosis in the ascending colon, transverse colon, descending colon, and sigmoid colon. Tr. at 2764. He removed the polyp and took multiple biopsies. *Id.*

Plaintiff presented to Physician Assistant Christopher C. Smith ("PA Smith") at CCC on May 30, 2018, after being hospitalized for chest pain. Tr. at 3081. PA Smith noted Plaintiff had "patent grafts but severe native vessel disease, essentially deemed inoperable." *Id.* He stated Plaintiff had been unable to tolerate an increased Coreg dose to 37.5 mg twice a day because it caused hypotension. *Id.* He indicated Plaintiff was subsequently started on Ranexa, but was uncertain as to its effectiveness because he continued to experience chest pain at rest and upon exertion. *Id.* He denied taking sublingual nitroglycerin, as it caused him to experience headaches. *Id.* He

endorsed some dizziness, but no frank syncope and indicated it had decreased since he had reduced Coreg back to 25 mg twice a day. *Id.* He endorsed shortness of breath upon exertion, but denied orthopnea, lower extremity edema, and palpitations. *Id.* His blood pressure was low at 88/67 mmHg and his pulse was elevated at 93 BPM. Tr. at 3084. PA Smith increased Ranexa to 1000 mg twice a day. *Id.* He wrote: "[Plaintiff] has class 3–4 angina. He is unable to maintain gainful employment given his chest pain at rest and with minimal exertion." *Id.*

On June 8, 2018, Plaintiff reported stable back pain and reflux. Tr. at 2377. He indicated Isosorbide had been discontinued and Ranexa added during his hospitalization for chest pain a few weeks prior. *Id.* Dr. Nations noted Plaintiff's blood pressure was stable and he had lost a few pounds. *Id.* He observed TTP in the paraspinous muscles adjacent to the lumbar spine. Tr. at 2381. He refilled Plaintiff's medications, counseled him on diet and exercise, encouraged smoking cessation, and instructed him to continue checking and recording his blood sugar readings. *Id.*

Plaintiff presented to the ER at GMH, with chest pain on June 10, 2018. Tr. at 2768. He described substernal left-sided chest pain that radiated to the left side of his neck and down his left arm and was accompanied by dyspnea, nausea, and dry heaving. *Id.* He was admitted for further observation. Tr. at 2770. Chest x-rays showed a mild interstitial infiltrate

that was possibly related to mild pulmonary edema. *Id.* Plaintiff was discharged the following day. Tr. at 2768.

On June 28, 2018, Plaintiff presented to the ER at GMH with syncopal symptoms and was admitted. Tr. at 2791–92. He reported infrequent syncopal episodes over the prior month that appeared to be primarily related to exertion. Tr. at 2792. His wife worried that Plaintiff might be dehydrated and reported that he had brown urine. *Id.* Plaintiff also described a brief episode of sharp, stabbing left chest pain. *Id.* Chest x-rays showed no acute cardiopulmonary process. Tr. at 2796. Troponin was negative, and Plaintiff's symptoms were considered to be consistent with dehydration and not cardiac in nature. Tr. at 2797. He improved after receiving intravenous fluids. *Id.* Elizabeth Page Bridges, M.D. ("Dr. Bridges"), indicated Plaintiff's syncope was likely orthostatic in nature, but that arrhythmia was also a possibility. *Id.* She recommended a Holter monitor, but Plaintiff and his wife insisted he be discharged before one could be applied. *Id.*

On July 2, 2018, PA Smith noted that Plaintiff had presented to the ER twice since his visit one month prior. Tr. at 3114. Plaintiff indicated he continued to experience syncopal episodes that occurred upon alternating from a seated to a standing position and with physical activity. *Id.* He endorsed occasional chest pain, fatigue, and shortness of breath. *Id.* PA Smith indicated there was an orthostatic component to Plaintiff's syncope.

43

Tr. at 3117. He reduced Losartan to 50 mg daily and ordered a five-day Holter monitor to evaluate for arrhythmia/bradycardia. *Id.* He noted Plaintiff had no improvement on Ranexa and was intolerant of long-acting nitrates. *Id.* He stated Plaintiff was "[u]nable to maintain gainful employment due to class 3–4 angina and syncope." *Id.*

Plaintiff presented to the ER at GMH with chest pain on July 8, 2018. Tr. at 2808. He rated his chest pain as a nine and described feeling as if his chest were being crushed. *Id.* An EKG and lab studies showed no evidence of myocardial infarction ("MI"). Tr. at 2812. Plaintiff consulted with a cardiologist, who discontinued Losartan and changed Plaintiff from Coreg to Metoprolol. *Id.* Selom Avotri, M.D., discharged Plaintiff to follow up with his cardiologist within a week. *Id.*

Plaintiff followed up with PA Smith on July 16, 2018. Tr at 3129. He reported "doing great" and denied dizziness. *Id.* He indicated chest pain continued to be a problem at times. *Id.* PA Smith noted that the doctor in the ER discontinued Losartan and changed Coreg to Metoprolol 50 mg twice a day. *Id.* He explained that Plaintiff's Holter monitor showed one four-beat run of paroxysmal atrial tachycardia, but no malignant arrhythmia or bradycardia. *Id.* He indicated orthostatic hypotension had been resolved with discontinuing Losartan. Tr. at 3132. He increased Metoprolol to 75 mg in the morning and 50 mg in the afternoon. *Id.* He indicated he would increase

Metoprolol to 75 mg twice a day if Plaintiff tolerated the increased morning dose for a week or would decrease the dose to 50 mg twice a day if he reported dizziness, syncope, or fatigue. *Id.*

On August 1, 2018, Plaintiff reported his chest pain had remained the same and endorsed generalized fatigue. Tr. at 3144. PA Smith noted Plaintiff's angina remained at its baseline. Tr. at 3146. He prescribed Toprol 25 mg twice a day to address generalized fatigue and indicated he would increase Plaintiff's Metoprolol dose if Toprol increased his chest pain. *Id.*

On August 22, 2018, PA Smith noted Plaintiff had at least two ER visits for chest pain over the prior four-week period.[3] Tr. at 3158–59. He stated EKG was unchanged and Troponins were within normal limits both times. Tr. at 3159. Plaintiff reported nitroglycerin had provided no relief. *Id.* He indicated isosorbide caused him severe headaches. *Id.* He stated Ranexa was ineffective in controlling his symptoms. *Id.* PA Smith increased Metoprolol to 100 mg in the morning and 50–75 mg in the evening. Tr. at 3161. He stated there appeared to be a muscle spasm component to his chest pain and prescribed Flexeril 10 mg three times a day for muscle spasms. *Id.* He indicated Plaintiff "remain[ed] unable to maintain gainful employment." *Id.*

---

[3] PA Smith noted that Plaintiff most recently visited the ER at St. Francis, Tr. at 3159, and the record contains no treatment notes from St. Francis during the relevant period.

On September 12, 2018, Dr. Nations noted Plaintiff's blood pressure, weight, reflux, and back pain were stable, but he had recently visited the ER two-to-three times for chest pain. Tr. at 2371. Plaintiff admitted to smoking a pack of cigarettes per week. *Id.* Dr. Nations noted TTP in the paraspinous muscles adjacent to the lower lumbar spine. Tr. at 2375. He refilled Plaintiff's medications, encouraged him to stop smoking and to continue to monitor and record his blood sugar, and provided counseling on diet and exercise. *Id.*

Plaintiff presented to PA Smith for cardiology follow up on September 19, 2018. Tr. at 3174. He reported feeling "about the same" with occasional episodes of chest pain and use of sublingual nitroglycerin and chest soreness on the days following these episodes. *Id.* PA Smith assessed CAD with class III angina. Tr. at 3176. He noted Plaintiff remained unable to maintain gainful employment and should be considered disabled from his cardiac issues. *Id.*

Plaintiff was admitted to GHS on October 7, 2018, after being transferred from BEH.[4] Tr. at 2826. Upon transfer, he rated his pain as a 10, but was calm, had no diaphoresis, had stable vital signs, and was able to speak in complete sentences and add stories to the conversation. *Id.* He underwent left heart catheterization that showed three patent grafts, normal

---

[4] The record contains notes from BEH through July 7, 2016, Tr. at 1748, but does not include records from any ER visits or hospitalizations at BEH subsequent to this date.

left ventricular function, and patent ductus arteriosus ("PDA") too small for percutaneous coronary intervention ("PCI"). Tr. at 2846. He underwent placement of a drug-eluting stent ("DES") to saphenous vein graft ("SVG") to obtuse marginal artery ("OM"). Tr. at 2823. Aubrey Jean Smith, PA, discharged Plaintiff on October 9, 2018, with instruction to follow a diet low in cholesterol and saturated fat; to abstain from heavy lifting, straining, stooping, or tub bathing for a week; and to monitor the catheterization site for signs of infection. Tr. at 2827. She started Plaintiff on Plavix 75 mg and instructed him to take half of a Losartan 100 mg tablet daily and Omeprazole 40 mg twice daily. Tr. at 2827–28.

Plaintiff returned to the ER at GMH on October 12, 2018, with chest pain. Tr. at 2853 He received Plavix and was placed on a heparin drip. *Id.* EKGs and serial Troponin lab studies were normal, ruling out acute MI. *Id.* Jesse Paul Jorgenson, M.D., noted Plaintiff's description of symptoms sounded more pleuritic than cardiac in origin. *Id.* He discharged Plaintiff to follow up with his cardiologist in two weeks. *Id.*

On October 17, 2018, Plaintiff presented to the ER at GMH with bilateral chest pain. Tr. at 2879. Kevin A. Applegate, M.D., noted musculoskeletal tenderness. Tr. at 2881. He checked Plaintiff's Troponin level and ordered an EKG. Tr. at 2882. He consulted with a cardiologist, who found no indication for admission, as Plaintiff's pain was more consistent

with non-cardiac etiology. *Id.* He recommended a trial of Isordil Dinitrate and close cardiology follow up. *Id.*

Plaintiff presented to Jonathan T. Frazier, NP ("NP Frazier"), at CCC for follow up on October 31, 2018. Tr. at 3189. He reported ongoing atypical chest pain. *Id.* NP Frazier noted Plaintiff was taking three antianginals without improvement. *Id.* Plaintiff indicated he was able to participate in cardiac rehabilitation without symptoms, except that he felt sore on the following day. *Id.* He noted he felt as if his recurrent chest pain had started after he sustained multiple rib fractures. *Id.* NP Frazier observed Plaintiff to have chest wall and left posterior chest wall TTP. Tr. at 3192. He assessed precordial pain that appeared to be musculoskeletal, as it was reproducible with palpation. Tr. at 3193. He offered a referral to pain management, but Plaintiff declined. *Id.*

On November 21, 2018, Plaintiff reported no difference in his chest pain following placement of his most recent cardiac stent. Tr. at 3204. He said he did well while engaged in exercise during cardiac rehabilitation, but felt "washed out" and experienced chest discomfort on the following day. *Id.* He questioned whether his pain might be related to his history of rib fractures. *Id.* He denied having started Isordil Dinitrate. Tr. at 3207. PA Smith discussed angina versus musculoskeletal chest pain versus acute

48

coronary syndromes. *Id.* He advised Plaintiff to continue aggressive risk factor modification and nitrates when necessary. *Id.*

On December 21, 2018, Plaintiff reported his anxiety was well-controlled and his back pain resulted in good and bad days. Tr. at 2956. He complained of occasional episodes of dizziness and lightheadedness upon standing from a seated position, but denied syncope. *Id.* He admitted he smoked an occasional cigarette and indicated his blood sugars were in the 120s. *Id.* Dr. Nations noted Plaintiff's blood pressure was stable, but he had gained several pounds. *Id.* He recorded normal findings on physical exam. Tr. at 2960. He continued Plaintiff's medication, encouraged smoking cessation, and instructed Plaintiff to continue to monitor and record his blood sugar readings. Tr. at 2960–61.

Plaintiff reported improved chest pain on January 3, 2019. Tr. at 3220. He denied having visited the ER and indicated he had only required sublingual nitroglycerin twice since his last visit. *Id.* His blood pressure was elevated as he had recently run out of medication. *Id.* PA Smith continued the same treatment regimen and instructed Plaintiff to return in six months. Tr. at 3222. He noted Plaintiff "remain[ed] unable to maintain gainful employment." *Id.*

Plaintiff followed up with PA Smith on January 7, 2019. Tr. at 3234. He described chest pressure on the prior night that had responded to

sublingual nitroglycerin, but indicated the pressure had returned that morning and failed to respond to nitroglycerin. *Id.* An EKG revealed normal sinus rhythm with no ischemic changes. *Id.* PA Smith informed Plaintiff that the EKG was normal, but that he could not completely rule out anginal chest pain. Tr. at 3237. He encouraged Plaintiff to go to the ER for further testing, but Plaintiff refused to do so, noting he would go home, rest, and take nitroglycerin as needed. *Id.* PA Smith told him that he needed to seek emergency care immediately if he took three nitroglycerin within 15 minutes and had no improvement in his chest pain. *Id.*

Plaintiff presented to the ER at GMH with chest pain on January 16, 2019. Tr. at 2896. He described the pain as "an elephant sitting on [his] chest" with radiation to his jaw and left arm. *Id.* He indicated his chest pain was not relieved with sublingual nitroglycerin. *Id.* His blood pressure was initially elevated. Tr. at 2897. A stress test was normal. Tr. a 2896. Adam Todd Ratchford, M.D., increased Plaintiff's Amlodipine dose, refilled his short-acting nitroglycerin, and instructed him to follow up with his cardiologist as soon as possible. Tr. at 2895.

Plaintiff reported to the ER at GMH with right-sided rib pain on February 10, 2019. Tr. at 2926. He indicated he had presented to the ER at BEH two days prior, where he was diagnosed with an acute left posterior seventh rib fracture. *Id.* He stated his pain was not well-controlled and feared

he had broken more ribs. *Id.* His blood pressure was elevated at 177/90 mmHg. Tr. at 2928. A CT scan of Plaintiff's chest showed no acute rib fractures. Tr. at 2929. Julie Prager Smith, M.D., declined to prescribed further narcotics, as Plaintiff had active prescriptions for Hydrocodone and Diazepam. *Id.* She instructed Plaintiff to follow up with his PCP and to return to the ER if his symptoms worsened. *Id.* She offered a prescription for Lidoderm patches, but Plaintiff declined the offer as he had some at home. *Id.*

Plaintiff returned to the ER at GMH on February 14, 2019, with a complaint of anginal chest pain. Tr. at 2936. He reported nitroglycerin had failed to alleviate his symptoms. *Id.* An EKG was unchanged and Troponin levels were normal. Tr. at 2938. Chest x-rays showed no pneumothorax or evidence of pneumonia. *Id.* Caroline Redmond Stoddard, M.D., declined Plaintiff's request for stronger opioid pain medications. *Id.* She discharged Plaintiff with instruction to follow up with Dr. Nations. *Id.*

On May 3, 2019, Plaintiff reported fairly well controlled anxiety and depression, stable reflux, and good and bad days as to his back pain. Tr. at 2972. He endorsed some rib pain. *Id.* He admitted to smoking a pack of cigarettes per week and indicated his fasting blood sugar readings were typically around 130 mg/dL. *Id.* Dr. Nations noted Plaintiff's weight and blood pressure were stable. *Id.* He observed TTP in the paraspinous muscles adjacent to the lower lumbar spine. Tr. at 2976. He renewed Plaintiff's

prescriptions, recommended he continue to monitor and record his blood sugar readings, and encouraged him in his efforts to stop smoking. Tr. at 2976–77.

Plaintiff followed up with Dr. Nations on May 20, 2019, after having been diagnosed with diverticulitis in the ER. Tr. at 2988. He admitted the antibiotics had provided some relief, but continued to endorse abdominal pain. *Id.* Dr. Nations prescribed Oxycodone 5 mg. Tr. at 2992.

On July 2, 2019, PA Smith noted Plaintiff had presented to the ER on several occasions for chest and abdominal pain since his last visit. Tr. at 3251. Plaintiff endorsed chest tightness at rest and with minimal activity. *Id.* He admitted his chest tightness was generally relieved by sublingual nitroglycerin, but indicated the nitroglycerin caused severe headaches. *Id.* Plaintiff reported weakness, fatigue, and dyspnea with minimal exertion. *Id.* PA Smith advised Plaintiff to continue aggressive risk factor modification, to quit smoking, and to properly use sublingual nitroglycerin. Tr. at 3253. He noted Plaintiff was "[u]nable to maintain full and gainful employment in any capacity." *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearings

a.    Plaintiff's Testimony

i.    July 28, 2017

At the first hearing, Plaintiff testified he was right-handed. Tr. at 80. He said he lived with his wife, who received disability benefits for chronic obstructive pulmonary disease. Tr. at 80, 81–82. He stated he had last worked part-time at Papa John's Pizza in May 2016, delivering pizzas during five-hour shifts on two to four days per week. Tr. at 80–81. He indicated he worked in that job from September 2014 to May 2016. Tr. at 83. He said he quit the job because he was unable to continue to meet duties that included walking up and down stairs and driveways and scrubbing floors to maintain the store. *Id.*

Plaintiff testified he last worked full-time as a car salesman in 2014. Tr. at 81. He said he quit the job because he was unable to meet its standing and walking requirements. *Id.*

Plaintiff stated back and knee problems prevented him from sitting and standing for long periods. Tr. at 83. He said he experienced daily pain in his lower back. Tr. at 84. He testified he had previously been treated by a pain management physician, but was presently being treated by Dr. Nations, as his insurance had changed. *Id.* He said he treated his back pain with Norco

10 mg four times a day, Lidocaine patches, lying down, and sitting in a recliner. Tr. at 84–85. He denied having had surgical intervention. Tr. at 84.

Plaintiff testified as to problems with his bilateral knees, with the left being worse than the right. Tr. at 85. He said he had undergone prior surgeries to both knees. Tr. at 85–86. He indicated his knee pain was worsened by walking on uneven ground, climbing stairs, stooping, and standing from a squatting position. Tr. at 86. He said his left knee pain increased if he attempted for walk for 30 minutes. Tr. at 87. He acknowledged having prior injections to his knees, but indicated he had not received any since Dr. Nations took over his pain management. *Id.* He denied receiving relief from the injections. *Id.*

Plaintiff testified his ability to work was also affected by stomach problems related to gastroparesis. *Id.* He said he took medication for two months and discontinued it for one month at a time.[5] Tr. at 88. He stated he was "almost bedridden," unable to eat solid foods, and in constant pain during the months that he did not take the medication. *Id.* He described the pain as located in his stomach and esophagus. *Id.* He said he experienced loose stools and diarrhea. Tr. at 89.

---

[5] Plaintiff appears to be referring to Erythromycin, as the record reflects that he was required to take "holidays" from using the medication. Tr. at 1933, 2710.

Plaintiff confirmed that he had undergone a third Nissen procedure in August of the prior year. Tr. at 88. He denied having had additional surgery thereafter. *Id.* He admitted he had been to the ER multiple times since undergoing the most recent Nissen procedure, but noted his ER presentations had not been for stomach problems. Tr. at 89.

Plaintiff testified having broken ribs due to coughing from pneumonia in March. Tr. at 89–90. He said he had broken seven ribs prior to his first ER visit and four a week later. Tr. at 90. He noted he subsequently returned to the ER after having broken one rib on one occasion and two ribs on another occasion. *Id.* He explained that osteopenia had caused his bones to become brittle and break more easily. *Id.*

Plaintiff testified he felt depressed because of his health problems and had difficulty getting along with people. *Id.* He said he experienced panic attacks and anxiety and could "fly off the handle with people." Tr. at 91. He stated his medications made him feel drowsy and lethargic. *Id.*

Plaintiff estimated he could sit for 15 minutes before he needed to adjust or get up. *Id.* He said he could stand for about 30 minutes and walk for about 30 minutes on level ground. Tr. at 92. He indicated he could not lift over 10 pounds, noting he could not lift his dachshund. *Id.* He said he spent more than half of a typical day lying down or reclining in a recliner. *Id.*

Plaintiff indicated Dr. Nations was treating his back problems. Tr. at 93. He said he had previously seen a specialist for his back and had undergone an MRI. *Id.* He noted his CAD prevented him from working for long periods without rest. Tr. at 94. He said his diabetes had caused gastroparesis, but denied other problems related to diabetes. *Id.* He said his OSA caused trouble sleeping and made him feel grouchy upon waking. *Id.* He indicated he had started taking medication for depression in early 2012 and said the medication helped his depression. *Id.*

Plaintiff testified he had done little cooking since 2014. Tr. at 96. He denied doing dishes, cleaning laundry, folding clothes, ironing, sweeping, mopping, vacuuming, dusting, performing maintenance around his home, doing yard work, maintaining a garden, hunting, fishing, sewing, crocheting, or cleaning the bathroom, kitchen, and living room since 2014. Tr. at 96–98. He noted his wife did most of the cooking and household chores. *Id.* He said he did little driving. Tr. at 98. He noted he had traveled to Opelika, Alabama, to visit family once since 2014. Tr. at 98–99. He denied attending church and being involved in church activities. Tr. at 99. He said he rarely saw family and friends. *Id.* He admitted he used Facebook, text messaging, and email. *Id.* He denied doing research on the internet. *Id.* He said he did not go to clothing, grocery, or convenience stores, as his wife did the shopping. *Id.* He denied having been involved in hobbies, clubs, or groups, attended sporting

events, or visited movie theaters, parks, beaches, or lakes since 2014. Tr. at 99–100. He said he had gone out to eat a few times and enjoyed reading and watching birds from his back porch. Tr. at 100. He rated his back pain as a nine, his left knee pain as a nine, and his right knee pain as a six. Tr. at 100–01.

Plaintiff testified he worked for two years at Norris Automotive as a car salesman. Tr. at 102. He said he had previously worked for LKQ A&R Auto Parts as a truck driver, loading trucks, delivering auto parts throughout the state, and unloading items that were returned. Tr. at 103–04.

### ii.    July 30, 2019

At the second hearing, Plaintiff testified his mother had recently moved into his home because she had dementia. Tr. at 53–54. He stated he had attempted to work at Advance Auto Parts in 2018, but only worked for half a day. Tr. at 55. He stated he had been under the impression that he would be working as a delivery driver, but left the job upon learning that he would be expected to perform heavy lifting to stock shelves. *Id.* He said he also worked for a couple of months for Carolina Auto Auction, where he drove cars for the auction on one day a week for two to three hours. *Id.* He indicated he left the job because he was expected to do more walking and climbing up and down a hill than he had expected. *Id.*

Plaintiff testified his osteopenia had worsened since his prior hearing. *Id.* He stated his ribs were brittle and easily broken. *Id.* He said coughing, sneezing, and moving the wrong way had caused them to break. Tr. at 56. He noted his heart problems had worsened and he had undergone placement of another stent in October 2018. *Id.* He confirmed that he had a triple bypass in November 2011. *Id.* He said he experienced chest pain nearly every day. Tr. at 57. He indicated it was caused by very little exertion and sometimes occurred without exertion. *Id.* He stated he became short of breath quickly. *Id.* He estimated he could walk for 15 minutes and stand for 15 minutes at a time. Tr. at 58. He said he could likely stand and walk for an hour in an eight-hour workday. *Id.* He indicated he continued to treat with Dr. Nations and PA Smith. *Id.*

Plaintiff denied seeing a psychologist, psychiatrist, or mental health provider. Tr. at 59. He said he had not been hospitalized for mental health reasons. *Id.* He stated he was taking Valium and Venlafaxine, which Dr. Nations had prescribed for mental impairments. *Id.* He said gastroparesis caused him to have severe stomach pain, diarrhea, and constipation. *Id.* He noted the severe pain occurred at least once a week and lasted for as little as a couple of hours and as long as the entire night. Tr. at 60. He said he experienced diarrhea once a week that lasted for a couple of days. *Id.* He denied using a CPAP machine because of difficulty adjusting to the mask. *Id.*

Plaintiff described having performed light cooking, a little laundry, and dusting since July 2017. Tr. at 60–61. He denied having swept, mopped, vacuumed, taken out the trash, or cleaned the bathroom or living room since that time. Tr. at 61. He said his wife generally performed household chores. *Id.* He testified he mainly sat with and watched out for his mother. Tr. at 62. He noted his mother remained mobile and was able to care for her own personal needs. *Id.* He admitted he administered his mother's medications and transported her to doctors' visits. *Id.* He denied managing his mother's financial affairs. *Id.* He said he drove very little. *Id.* He denied having been outside the state since July 2017 and stated he rarely attended religious services. *Id.* He admitted he used Facebook, texted, and emailed, but denied performing research on the internet. Tr. at 62–63. He said he did not visit grocery stores, clothing stores, and convenience stores or parks, beaches, or lakes. Tr. at 63. He denied having hobbies and going to movies. *Id.* He said he read and watched television. *Id.* He noted he rarely went out to eat. *Id.*

### b.    Vocational Expert Testimony

#### i.    July 28, 2017

VE Benson Hecker reviewed the record and testified at the first hearing. Tr. at 101–08. The VE categorized Plaintiff's PRW as an automobile salesperson, as requiring light exertion with a specific vocational preparation ("SVP") of 6; a truck driver, *DOT* number 905.663-014, as requiring medium

exertion with an SVP of 4; and a pizza delivery driver, *DOT* number 299.477-010, as requiring medium exertion with an SVP of 2. Tr. at 104. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently; stand for six of eight hours; walk for six of eight hours; sit for six of eight hours; never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; and avoid concentrated exposure to temperature extremes, wetness, humidity, and hazards. Tr. at 104–05. The VE testified the hypothetical individual could perform Plaintiff's PRW as an automobile salesperson. Tr. at 106. The ALJ asked whether there were any other jobs the hypothetical person could perform. *Id.* The VE identified jobs at the light exertional level with an SVP of 2 as a mail clerk, *DOT* number 209.687-026 and a cashier, *DOT* number 211.462-010, with 95,000, and 1,500,000 positions in the national economy, respectively. *Id.* The VE confirmed his testimony was consistent with the *DOT. Id.*

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited to standing for two-and-a-half hours, walking for two-and-a-half hours, and was otherwise limited as described in the first hypothetical question. Tr. at 106–07. He asked if the individual would remain capable of performing Plaintiff's PRW. Tr. at 107. The VE stated he could. *Id.* The ALJ asked if the additional

restrictions would affect the other work the VE identified. *Id.* The VE testified they would not. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who would be off-task for variable periods each day, as needed. *Id.* He asked if this restriction would affect the VE's prior responses. *Id.* The VE stated the restriction would preclude all work. *Id.*

Plaintiff's attorney asked the VE to consider that the individual described in the first hypothetical question would be limited to standing and walking for two hours or less during an eight-hour workday. *Id.* He asked how that would affect his response. *Id.* The VE testified that it would preclude Plaintiff's PRW. Tr. at 108.

Plaintiff's attorney asked the VE to consider that the individual described in the first hypothetical question would be limited to simple, routine, repetitive tasks. *Id.* He asked how such a restriction would affect the VE's response to the first hypothetical question. *Id.* The VE testified the individual would be unable to perform Plaintiff's PRW, as it required a higher SVP. *Id.*

Plaintiff's attorney asked if there would be any jobs if the individual were to miss an average of four or more days per month. *Id.* The VE stated there would be no jobs. *Id.*

ii.     July 30, 2019

VE Beth Crain reviewed the record and testified at the second hearing. Tr. at 64–71. The VE categorized Plaintiff's PRW as a delivery driver, *DOT* number 292.353-010, as requiring medium exertion with an SVP of 3, and an automobile salesperson, *DOT* number 273.353-010, as requiring light exertion with an SVP of 6. Tr. at 66. The ALJ asked if Plaintiff's PRW produced transferable skills. *Id.* The VE stated it did not. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently; stand for six of eight hours; walk for six of eight hours; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop; occasionally kneel, crouch, and crawl; and should avoid concentrated exposure to temperature extremes, humidity, wetness, and hazards. *Id.* He asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE testified that the hypothetical individual could perform work as an automobile salesperson as actually and generally performed. Tr. at 66–67. The ALJ asked whether there were any other jobs that the hypothetical person could perform. Tr. at 67. The VE identified light jobs with an SVP of 2 as a small parts assembler, *DOT* number 706.684-022, and a cashier, *DOT* number 211.462-010, with 196,000 and 1,270,000 positions in the national economy, respectively. *Id.*

The ALJ asked if the VE's testimony was consistent with the *DOT* and in accordance with SSR 00-4p. *Id.* The VE stated it was. *Id.* The ALJ asked if there were any conflicts between the VE's testimony and the *DOT*. *Id.* The VE testified there were no conflicts. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who could stand for two-and-a-half hours a day, walk for two-and-a-half hours a day, and was otherwise limited as described in the first hypothetical question. *Id.* He asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE testified the restrictions would preclude Plaintiff's PRW. Tr. at 68. She explained that an automobile salesperson is required to walk up to six hours per day. *Id.* The ALJ asked if the additional restriction would affect the VE's response as to other work. *Id.* The VE testified it would eliminate all jobs at the light exertional level. *Id.*

Plaintiff's attorney asked the VE if an automobile salesperson would be required to be outside with customers. *Id.* The VE responded in the affirmative. *Id.* Plaintiff's attorney asked if the requirement to be outside would violate the restrictions in the hypothetical question as to temperature and humidity. *Id.* The VE confirmed that it would in some parts of the country. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would be off-task an average of 15% of the workday or would be absent from work on two or more days per month. *Id.* He asked if there would be jobs given either of those conditions. *Id.* The VE testified that both conditions would preclude work. Tr. at 69.

Plaintiff's attorney asked the VE to consider that the individual would be limited to simple, routine, repetitive tasks and would otherwise be limited as described in the first hypothetical question. *Id.* He asked if Plaintiff's PRW could be performed. *Id.* The VE testified it could not. *Id.*

The ALJ asked the VE if she knew what portion of an automobile salesperson's day was inside the showroom or a car, where temperature extremes and humidity could be controlled. *Id.* The VE stated it would vary. *Id.* The ALJ asked if an individual could perform work as an automobile salesperson if he could frequently be exposed to temperature extremes and humidity. *Id.* The VE stated the individual could perform the job. *Id.* The ALJ asked if an individual could perform work as an automobile salesperson if limited to occasional exposure to temperature extremes and humidity. Tr. at 70. The VE testified that he could not. *Id.*

The ALJ again asked if there were any inconsistencies between the *DOT* and the VE's testimony. *Id.* The VE stated there were not. *Id.* However,

she clarified that her testimony as to weather extremes was based on her training, education, and experience. *Id.*

      2.   Investigation

Following Plaintiff's second hearing, the Cooperative Disability Investigations ("CDI") Unit initiated an investigation of Plaintiff. Tr. at 3290–3303. The investigator confirmed that Plaintiff had an active driver's license. Tr. at 3291. Records from Advance Auto Parts indicated Plaintiff had started a job as a driver on February 12, 2018, that ended on February 21, 2018. Tr. at 3293. The investigator confirmed that Plaintiff had active Facebook, Twitter, LinkedIn, and Pinterest accounts. Tr. at 3296.

The investigator interviewed Witness #1 who was employed by Toyota of Easley. *Id.* Witness #1 stated Plaintiff was a former employee who had left the job about a year-and-a-half prior citing medical reasons. *Id.* Witness #1 noted another employee had subsequently seen Plaintiff driving a pizza delivery truck. *Id.* The investigator subsequently visited four pizza restaurants, and no one at any of the four restaurants indicated they had employed Plaintiff. Tr. at 3296–97.

The investigator interviewed Witness #2, Plaintiff's neighbor, who informed him that she considered Plaintiff a friend. Tr. at 3297. Witness #2 indicated Plaintiff served as a caregiver for his elderly mother who lived with him and had dementia. *Id.* Witness #2 stated Plaintiff volunteered to drive

homeless people to doctors' visits several times a week. *Id.* Witness #2 also noted Plaintiff had informed him/her that he would break a rib every time he bent over. *Id.*

The investigator interviewed Plaintiff, who was upset because the investigator had been monitoring his activity. *Id.* The investigator described Plaintiff as standing without the aid of a mobility device, having normal gait and a straight back, complaining of no problems with his back, and reporting knee problems. Tr. at 3298. Plaintiff admitted that he volunteered to transport recovering addicts to their doctors' appointments. *Id.* He reported he had broken ribs upon sneezing and had been at the hospital the prior night for that problem. *Id.* He admitted he sometimes drove to the store to purchase cigarettes. *Id.*

The investigator interviewed Witness #3, a clerk at a convenience store near Plaintiff's home. *Id.* Witness #3 indicated Plaintiff had visited the store a month prior to purchase cigarettes, was friendly and capable of carrying on a conversation, used no mobility aid, had no gait disturbance, and showed no difficulty standing and walking. Tr. at 3298–99.

The investigator interviewed Witness #4, a clerk at another store near Plaintiff's home. Tr. at 3299. Witness #4 stated Plaintiff had been in the store "very recently," was friendly and capable of carrying on a conversation, was not alone when he visited the store, did not use a mobility device, had a

normal gait, had no difficulty standing and walking, was able to carry his purchases from the store, and had not appeared to be in pain. *Id.*

The investigator interviewed Witness #5, another clerk in a store near Plaintiff's house. Tr. at 3299–3300. Witness #5 indicated Plaintiff had visited the store within the prior couple of weeks. Tr. at 3300. He/she initially indicated Plaintiff was "sort of" friendly and capable of carrying on a conversation, but subsequently stated Plaintiff "don't want to talk to anybody and he is rude." *Id.* Witness #5 indicated Plaintiff was always alone, never relied on a mobility aid, had no difficulty standing or walking, and was able to lift and carry his purchases. *Id.*

The investigator interviewed Witness #6, a CVS Pharmacy employee. Tr. at 3300–01. Witness #6 indicated Plaintiff had been a regular customer until March 2018. Tr. at 3300. She noted Plaintiff had not visited the store alone, was friendly and capable of carrying on a conversation, had used a cane from time to time, had no gait disturbance or difficulty standing or walking, and was able to lift and carry his purchases from the store. Tr. at 3300–3301.

The investigator interviewed Witness #7, a Walgreen's employee. Tr. at 3301–02. Witness #7 indicated Plaintiff had last visited the store about a month prior and typically used the drive-thru to pick up medication. Tr. at 3301. Witness #7 described Plaintiff as friendly and having a slight limp. *Id.*

She indicated Plaintiff had spoken of being in pain and had appeared to be in pain at times, but had no difficulty standing or walking and was able to carry purchases from the store. *Id.*

The investigator interviewed Witness #8, an employee of a convenience store near Plaintiff's house. Tr. at 3302. Witness #8 had observed Plaintiff in the store about a week prior. *Id.* He noted Plaintiff was "in and out" and had once or twice appeared to be in pain. *Id.* He denied observing Plaintiff relying on an assistive device and indicated he had no problem standing or walking and was able to lift and carry his purchases from the store. *Id.*

3.    The ALJ's Findings

In his decision dated January 6, 2020, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2021.
2.    The claimant has not engaged in substantial gainful activity since September 1, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, osteopenia, osteoarthritis of the bilateral knees, coronary artery disease, diabetes mellitus, obstructive sleep apnea, gastroparesis, dysphagia (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can frequently climb ramps and stairs, but never climb

ladders, ropes, or scaffolds. The claimant can occasionally stoop, kneel, crouch and crawl. He should avoid frequent exposure to temperature extremes, humidity, and wetness. He should avoid concentrated exposure to hazards.

6. The claimant is capable of performing past relevant work as an automobile salesperson, Dictionary of Occupational Titles ("DOT") 273.353-010. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2014, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 18–32.

## II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) substantial evidence does not support the RFC assessment; and

2) the ALJ did not provide valid reasons for discounting PA Smith's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.   Legal Framework

#### 1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

69

impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5)

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the

Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390,

401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

   B.    Analysis

      1.    RFC Assessment

Plaintiff argues the ALJ did not properly explain his reasons for concluding that he could stand and walk for six hours in an eight-hour workday. [ECF No. 15 at 20–]. He claims the ALJ provided no explanation for the conclusion that his ability to stand and walk improved between his 2017 and 2020 decisions. *Id.* at 21–24. He maintains the ALJ did not explain how his activities and failed work attempts supported the assessed RFC. *Id.* at 24–26. He contends that examination findings supported greater restrictions. *Id.* at 26–27.

The Commissioner argues the ALJ was not required to explain his deviation from the RFC he assessed in his 2017 decision because that decision was vacated by the Appeals Council, allowing for de novo review on

remand. [ECF No. 16 at 15]. He maintains the ALJ relied on Plaintiff's ADLs and other evidence, including the CDI report, in restricting him to a range of light work. *Id.* at 15–16. He contends the ALJ considered all the evidence in assessing Plaintiff's RFC. *Id.* at 16–19.

A claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). To properly evaluate a claimant's RFC, the ALJ must "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016). This function-by-function analysis requires the ALJ to consider the functions in 20 C.F.R. § 404.1545(b), (c), and (d). SSR 96-8p, 1996 WL 374184 at *1. The ALJ is to express the claimant's RFC in terms of the exertional levels of work only after having considered the individual functions in 20 C.F.R. § 404.1545(b), (c), and (d). *Id.* Relevant to Plaintiff's argument, the functions in 20 C.F.R. 404.1545(b) include "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions [that] may reduce [a claimant's] ability to do past work and other work."

"An ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (citing *Brown v. Commissioner*,

873 F.3d 251, 263 (4th Cir. 2017). He must identify the evidence that

supports his conclusion and "build an accurate and logical bridge from the

evidence to his conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir.

2016).

In his prior decision dated November 17, 2017, the ALJ found Plaintiff

had the RFC to perform light work, "except he could stand for 2.5 hours and

walk for 2.5 hours in an eight hour workday." Tr. at 162. He found Plaintiff

could perform his PRW as an automobile salesperson, as well as light jobs as

a mail clerk and cashier. Tr. at 176, 177. In granting the request for review

and remanding the case to the ALJ, the Appeals Council noted that Plaintiff

was "an individual of advanced age" at the time of the ALJ's decision, and

requested he obtain testimony from the VE to determine if Plaintiff had

transferable skills. Tr. at 188. It also noted the RFC for light work, with

exceptions for "stand[ing] for 2.5 hours and walk[ing] for 2.5 hours in an eight

hour workday" was "not addressed" in the *DOT* and required explanation as

to "inconsistenc[y]." Tr. at 189. Accordingly, the Appeals Council requested

the ALJ obtain testimony from the VE to include "an explanation of the basis

of information such as reduced sitting/standing capacities at the light level,

which are not addressed in the *Dictionary of Occupational Titles*." Tr. at 189.

On remand, the ALJ asked the VE to consider an individual of Plaintiff's

vocational profile who could stand for two-and-a-half hours a day; walk for

two-and-a-half hours a day; lift 20 pounds occasionally and 10 pounds frequently; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to temperature extremes, humidity, wetness, and hazards. Tr. at 67. The VE testified the restrictions would preclude Plaintiff's PRW, as an automobile salesperson is required to walk up to six hours per day, and would eliminate all jobs at the light exertional level. Tr. at 68. Thus, in obtaining the explanation the Appeals Council ordered, the ALJ learned that the RFC he assessed in his first decision would require a finding that Plaintiff was disabled based on the Medical-Vocational Guidelines. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.06 (directing finding of "disabled" for an individual unable to perform his PRW who is of advanced age, a high school graduate or more, and has a history of semiskilled or skilled work with no transferable skills). Thus, the regulations only permitted the ALJ to deny the claim if he found Plaintiff capable of performing his PRW or work above the light exertional level. The ALJ found Plaintiff could perform his PRW.

Although it is questionable that the ALJ assessed an RFC with greater exertional demands despite evidence of Plaintiff's increased impairments between the first and second hearings, the undersigned cannot find the ALJ's RFC assessment unsupported by substantial evidence merely because he previously assessed an RFC with lesser exertional demands and without

explicit explanation for the deviation. The ALJ's prior decision was rejected by the Appeals Council, and his prior RFC assessment has no res judicata effect because it was not administratively final. *See Smith v. Colvin*, 2015 WL 4885172 at *20, C/A No. 1:14-3387-DCN (D.S.C. Aug. 14, 2015) (explaining that most courts to have addressed the issue had held that ALJ's prior findings did not have to be treated as evidence and given appropriate weight in light of all relevant facts if the ALJ's prior decision had been vacated by the Appeals Council).

The undersigned has considered the ALJ's finding that Plaintiff could "stand and walk six of eight hours," Tr. at 24, given his explanation for the finding and the relevant evidence. The ALJ noted "[t]he claimant's testimony regarding sitting, standing, walking, lifting and the need to lay down most of the day is inconsistent with his robust activities reported by the CDI investigation (Exhibit B58F)." Tr. at 23. He wrote "[c]ontrary to his statements about not shopping CDI investigation interviewed employees at five different stores and the claimant was reported to be a regular customer more often coming to the stores alone (Exhibit B58F)." *Id.* He considered Plaintiff's "testimony regarding lifting, sitting, standing, and walking" and found it to be "inconsistent with reports that the claimant was moving furniture and goes to the drag strip (Exhibits B26F and B20F)." *Id.* He also considered Plaintiff's statements to be inconsistent with his role as "caregiver

for his mother who suffers dementia" and "his volunteer work transporting recovering addicts to the doctors (Exhibit B58F)". *Id.* He wrote that Plaintiff's "testimony regarding sitting, standing, walking and lifting" was inconsistent with Dr. Nations's report that he was working part-time from July 2017 through June 2018. Tr. at 24. He cited Plaintiff's earnings of $12,161 in 2014, $8,537 in 2015, and $2,961 in 2016. *Id.*

The ALJ recognized evidence of "severe medical impairments" that included DDD of his lumbar spine, a history of ACL surgery on the left knee, triple bypass surgery in 2011, and stent placement in 2018. *Id.* He indicated: "Based on the combined effect of all of the claimant's impairments, the claimant was restricted to lifting 20 pounds occasionally, 10 pounds frequently, sitting, walking and standing six of eight hours each." *Id.* He noted he had given "significant consideration" to Plaintiff's CAD and Dr. Nations's opinion "in concluding the claimant could stand and walk six of eight hours." *Id.* He wrote:

> For the reasons in the analysis discussed under Dr. Nations opinions I am persuaded the claimant can stand and walk six of eight hours. Briefly, the CDI investigation reveals multiple examples of the claimant walking with a normal gait in stores (B58F). The claimant's work activity and volunteering suggests greater ability to stand and walk than that opined by Dr. Nations. In addition, the claimant was reported moving furniture and going to the drag strip (Exhibits B26F and B20F). In July 2015 the claimant reported he will go to the grocery store on his own or go to Walmart, that he will do some walking in his neighborhood and that he will walk about 30 minutes without taking a break (Exhibit B26F).

*Id.*

The ALJ further explained that "physical examinations and diagnostic tests provide[d] inferences that the claimant [was] capable of performing a restricted range of light work. Tr. at 25. He cited "normal range of motion of the musculoskeletal system without tenderness, no leg swelling, stable angina," "no headaches, no neck pain, no paresthesia, no numbness, no weakness, . . . no pain, no joint stiffness, . . . normal breath sounds, no muscle pain and no joint swelling." *Id.* (citing Exhibits B54F and B56F (Tr. at 2519–2946 and Tr. at 3041–3283)). He noted "no joint redness, no gait disturbances, no loss of coordination, normal sensation, normal motor function, no weakness, no neurologic deficits[,] no tenderness and normal strength (Exhibits B56F, B54F, B53F, B45F, B40F, B38F, B37F, B34F, B25F, B23F, B20F, B19F and B18F)." Tr. at 27. He wrote: Examinations revealed 5/5 strength throughout, musculoskeletal system no deformities or tenderness, no neurologic deficits, normal gait, the claimant denied [changes] in mobility, there was no weakness, numbness or tingling, there were no sensory changes, there were no malaise or arthralgias, lower extremity had normal range of motion[,] the claimant was reported to ambulate without assistance, and reports of no back or muscle pain (Exhibits B45F, B44F, B40F, B27F, B19F and B16F)." *Id.* He claimed: "Other examinations revealed no back or muscle pain, no numbness or paresthesia, and x-rays of the

lumbar spine revealed degenerative changes with no evidence of fracture or other acute abnormality (Exhibits B54F, B56F, B20F and B19F)." *Id.*

The ALJ further explained:

The evidence notes osteopenia and rib fractures, tenderness in the lumbar spine, and knees, but no evidence of gait limitations or the need for an assistive device that would justify the standing and walking limitations assessed (Exhibit B51F/37, 42, 47). Many physical examinations have generally noted normal range of motion, no edema, normal gait, good range of motion in all joints (Exhibit B43F/14; B54F/6, 12; B56F/44). The claimant was treated conservatively with pain medication (Exhibit B40F/15).

Tr. at 28.

The record does not fully support the ALJ's conclusions as to the objective signs and symptoms. Although the ALJ claimed Plaintiff had "normal range of motion of the musculoskeletal system," all measures of his lumbar ROM showed reduced flexion to 80 degrees and reduced side bending to 20 degrees.[8] *See* Tr. at 1395, 1400, 1993, 1997, 2003. The record also refutes the ALJ's assertion that Plaintiff had no musculoskeletal tenderness, as multiple providers documented tenderness on exam. *See* Tr. at 1135, 1178, 1236–37, 1296, 1298–99, 1308–09, 1817, 1984, 2375, 2381, 2387, 2394, 2732–33, 2881, 2976. Contrary to the ALJ's claim that Plaintiff had "no headaches," the record reflects complaints of headaches associated with hypertension and

---

[8] "Normal forward flexion of the thoracolumbar spine is [0] to 90 degrees, extension is [0] to 30 degrees, left and right lateral flexion are [0] to 30 degrees, and left and right lateral rotation are [0] to 30 degrees." *Mercado v. Shinseki*, No. 12-1743, 2013 WL 5357054 at *1 n.2 (Vet. App. 2013) (quoting 38 C.F.R. § 4.71 a, Diagnostic Codes 5235-43, Note 2 (2013).

use of nitroglycerin and isosorbide. *See* Tr. at 1300, 1304, 3081, 3159, 3251. The record contains other objective findings the ALJ declined to address that arguably support Plaintiff's claims that he could not engage in prolonged standing and walking, including evidence of positive SLR and patellofemoral crepitus. *See* Tr. at 1135, 1179, 1746, 1993, 1997.

The ALJ's reference to "no pain" is not supported by the record. A review of the medical exhibits the ALJ cites includes ER presentations for complaints of chest, back, abdominal, and rib pain and notations of chest pain in cardiology progress notes. *See* Tr. at 2558, 2574, 2602, 2612, 2622, 2639, 2654, 2690, 2710, 2732, 2755, 2768, 2792, 2808, 2826, 2853, 2896, 2926, 2936, 2979, 3081, 3129, 3158–59, 3174, 3189, 3251. In addition, the remainder of the record documents Plaintiff's numerous presentations with chest, back, knee, abdominal, and rib pain. *See* Tr. at 485, 765, 1133, 1164, 1176, 1213, 1228, 1246, 1294, 1297, 1307, 1385, 1388, 1394, 1398, 1403, 1407, 1472, 1533, 1558, 1607, 1658, 1691, 1699, 1707, 1714, 1733, 1743, 1748, 1786, 1815, 1836, 1893, 1909, 1992, 1996, 2002, 2159, 2171, 2282, 2347, 2396, 2407, 2412, 2418, 2972, 2988, 2972.

Although the ALJ cited "stable angina" and "no cardiac chest pain," Tr. at 22 and 26, he did not thoroughly consider the frequency of Plaintiff's presentations with and complaints of chest pain. While cardiac etiology was often ruled out, it appears that Plaintiff had significant musculoskeletal chest

pain related to decreased bone density and a history of multiple rib fractures that resulted in exacerbation of chest pain following exertion and often at rest. *See* Tr at 2284, 2574, 2615, 2618, 2631, 2644–45, 2896, 2936, 2926, 3081, 3114, 3129, 3144, 3174, 3189, 3204, 3251.

The ALJ's conclusion that Plaintiff "generally had normal blood pressure readings," Tr. at 22 and 26, ignores the multiple notations of elevated blood pressure during periods in which Plaintiff reported distress and impressions of orthostatic hypotension on a few occasions. *See* Tr. at 1176, 1301, 1305, 1295, 1298, 1452, 1813, 1839, 1850, 1896, 1949, 1972, 2163, 2612, 2622, 2629, 2639, 2670, 2734, 2897, 2928, 3069, 3084. The ALJ also declined to resolve with his conclusions Plaintiff's reports of symptoms such as syncope, dizziness, fatigue, lightheadedness, dyspnea, and weakness that could reasonably affect his ability to stand and walk for six hours in an eight-hour workday. *See* Tr. at 2384, 2729, 2732, 2792, 2956, 3051, 3081, 3114, 3144, 3251.

The ALJ appears to have cherrypicked the CDI report, misstating some of the findings and citing the evidence that supported his conclusion while ignoring the evidence that did not. *See Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)) (stating "'[a]n ALJ has an obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability

while ignoring evidence that points to a disability finding.'"). The CDI report does not fully support the ALJ's characterization of Plaintiff as a "regular customer" at "five different stores" who "more often c[ame] to the stores alone," Tr. at 23, as it includes differing accounts as to whether Plaintiff visited stores alone and was "a regular customer." *See* Tr. at 3298–3302. The ALJ correctly noted that the witnesses observed Plaintiff to walk with normal gait, Tr. at 24, but he did not address Witness #6's report that Plaintiff "us[ed] a cane from time to time," Witness #7's impressions that Plaintiff had a slight limp, had spoken of being in pain, and had appeared to be in pain at times, or Witness #8's indications that Plaintiff was "in and out" of the store and had once or twice appeared to be in pain. Tr. at 3301–3302.

The ALJ claimed that Plaintiff's abilities to shop in stores, move furniture, visit the drag strip, serve as a caregiver for his mother who had dementia, maintain a driver's license, transport recovering addicts to medical appointments, and engage in part-time work activity belied his claims as to limited ability to stand and walk, but he did not explain how any of the activities he cited suggested Plaintiff was capable of standing and walking for six hours in an eight-hour workday. Tr. at 23–24. He also failed to consider the extent to which Plaintiff performed some of those activities. *See Woods*, 888 F.3d at 694; *Brown*, 873 F.3d at 263. Plaintiff injured his hand while moving furniture in July 2014, prior to his alleged onset date of disability.

*See* Tr. at 1356. No record after Plaintiff's alleged onset date indicates he was moving furniture. The record indicates Plaintiff visited the drag strip once in May 2015, developed heat exhaustion, and required an ER visit. Tr. at 1360, 1363. Nothing in the record suggests Plaintiff regularly visited the drag strip. Plaintiff testified he sat with his mother, watched out for her, administered her medications, and transported her to doctors' visits. Tr. at 62. However, he noted his mother remained mobile and continued to care for her own personal needs and financial affairs. *Id.* Plaintiff's activities in caring for his mother did not involve extended periods of standing and walking. His volunteer work driving recovering addicts to medical visits also did not require prolonged standing and walking.

Plaintiff's work activity and earnings after his onset date also fail to support a conclusion that he was capable of prolonged standing and walking. Although Plaintiff earned $12,161 in 2014, he did not allege he became disabled until September 2014. Therefore, most of his 2014 earnings are consistent with his full-time work until September. He earned $8,537 in 2015 and $2,961 in 2016, consistent with his testimony as to part-time work during those years. *See* Tr. at 83. During the first hearing, Plaintiff testified he last worked full-time as a car salesman in 2014. Tr. at 81. He said he quit the job because he was unable to meet its standing and walking requirements. *Id.* Plaintiff subsequently engaged in limited part-time work

that did not require extensive standing and walking. He testified he worked at Papa John's Pizza from September 2014 to May 2016, delivering pizzas during five-hour shifts on two to four days per week. Tr. at 80–81, 83. He said he quit the job because he was unable to continue to meet duties that included walking up and down stairs and driveways and scrubbing floors to maintain the store. *Id.* At the second hearing, Plaintiff testified he had attempted to work at Advance Auto Parts in 2018, but only worked for half a day because he was expected to lift heavy items to stock shelves, despite having been given the impression that he would be working as a delivery driver. Tr. at 55. He said he also worked for a couple of months for Carolina Auto Auction, where he drove cars for the auction on one day a week for two to three hours. *Id.* He stated he was unable to continue the job because it required more walking and climbing up and down a hill than he had expected. *Id.* Overall, Plaintiff's testimony as to his work activity from his alleged onset date forward largely supported his claim that he could not engage in prolonged standing and walking, as he sought jobs that did not require it and left jobs upon being unable to meet their standing and walking requirements. Thus, the evidence the ALJ cited showed Plaintiff was capable of performing some work over the relevant period, but not work that required he stand and walk for six hours in an eight-hour workday. *See Brown*, 873 F.3d at 263 (noting the ALJ erred in failing to explain "how those particular

activities—or any activities depicted by [the plaintiff]—showed that he could persist through an eight-hour workday").

Given the foregoing, the court cannot find that substantial evidence supports the ALJ's conclusion that Plaintiff was capable of standing and walking for six hours in an eight-hour workday.

### 2.    PA Smith's Opinion

PA Smith noted in multiple treatment reports that Plaintiff was unable to maintain gainful employment. *See* Tr. at 3081, 3117, 3161, 3176, 3222, 3253. He also completed a detailed physician questionnaire on June 14, 2019. Tr. at 3284–88. He identified himself as a PA with CCC who had treated Plaintiff beginning on May 30, 2018. Tr. at 3284. He stated Plaintiff's diagnosis was class III angina as confirmed by cardiac catheterization on October 8, 2018, with stent to SVG to OM branch and distal PDA disease that was inoperable. *Id.* He identified Plaintiff's symptoms as chest pain, anginal-equivalent pain, shortness of breath, fatigue, and weakness. *Id.* He stated Plaintiff had marked limitation of physical activity. Tr. at 3285. He acknowledged that Plaintiff's chest pain caused increased anxiety that worsened his chest pain and led to greater anxiety. *Id.* He considered Plaintiff incapable of even "low stress" jobs. *Id.* He noted any stress/anxiety would lead to angina/chest pain. *Id.* He stated Plaintiff had severe anxiety related to his heart issues. *Id.* He noted Plaintiff's experience of cardiac

symptoms was constantly severe enough to interfere with attention and concentration. Tr. at 3286. He indicated Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations he described. *Id.* He stated Plaintiff's medications caused hypotension, dizziness, and headache. *Id.* He noted Plaintiff would not improve. *Id.* He confirmed that Plaintiff's impairments had lasted or could be expected to last at least 12 months. *Id.* He estimated Plaintiff could walk less than one city block without rest, sit for one hour at a time, stand for 20 minutes at a time, sit for about two hours in an eight-hour workday, and stand/walk for less than two hours in an eight-hour workday. Tr. at 3286–87. He indicated Plaintiff needed a job that would permit shifting at will from sitting, standing, or walking. Tr. at 3287. He felt that Plaintiff would need to take unscheduled breaks for 15 to 20 minutes every one to two hours. *Id.* He indicated Plaintiff could occasionally lift less than 10 pounds; rarely lift 10 pounds, twist, stoop (bend), and crouch; and never climb stairs or ladders or lift 20 or 50 pounds. Tr. at 3288. He stated Plaintiff should avoid concentrated exposure to humidity and noise; even moderate exposure to wetness and extreme cold and heat; and all exposure to hazards (machinery, heights, etc.), fumes, odors, dusts, gases, poor ventilation, etc. *Id.* He anticipated Plaintiff would be absent from work on more than four days per month. *Id.*

Plaintiff argues substantial evidence does not support the ALJ's decision to discount PA Smith's opinion. [ECF No. 15 at 7–20]. He maintains the evidence the ALJ cited does not support the conclusion he reached, as evidence specifically related to CAD and repeated references to shortness of breath and chest pain refute his assessment of stable symptoms. *Id.* at 10–14. He claims the ALJ erred in discounting PA Smith's opinion because he was not a physician. *Id.* at 15. He contends his ADLs are not inconsistent with the restrictions PA Smith indicated and the ALJ erred in relying on an absence of gait disturbance and a report from 2015 as evidence of his ADLs. *Id.* at 15–16. He maintains the ALJ did not obtain clarification as to his activities or explain how activities like reading, watching television, and driving were inconsistent with PA Smith's opinion. *Id.* at 16–17.

The Commissioner argues the ALJ appropriately gave little weight to PA Smith's opinion. [ECF No. 16 at 10]. He maintains PA Smith was not an acceptable medical source under the applicable regulations. *Id.* He contends the ALJ appropriately considered the entire record in evaluating PA Smith's opinion. *Id.* at 10–12. He claims the ALJ noted he would have had to speculate to incorporate the restrictions PA Smith provided in the RFC, as the term "rarely" is not addressed in the *DOT*. *Id.* at 12. He maintains the ALJ reasonably concluded Plaintiff's ability to travel to Alabama showed he retained functional ability beyond that PA Smith assessed. *Id.* at 13. He

contends the ALJ appropriately considered that Plaintiff did not stop working due to symptoms of CAD. *Id.* at 13–14.

Because Plaintiff's claim for benefits was filed prior to March 27, 2017, the rules in 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, and 06-3p apply to the evaluation of the opinion evidence of record. *See* Rescission of SSR 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15,263 (Mar. 27, 2017); 20 C.F.R. § 404.1520c. The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments(s) including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical and mental restrictions." 20 C.F.R. 404.1527(a)(2); SSR 96-5p. ALJs must carefully consider medical opinions on all issues. SSR 96-5p. If a treating physician, psychologist, or other acceptable medical source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the ALJ is to "give it controlling weight." 20 C.F.R. § 404.1527(c)(2). However, if the record lacks an opinion from a treating physician, psychologist, or other acceptable medical source, five factors are utilized to determine what lesser weight should instead be accorded to the opinion. *Brown*, 873 F.3d at 256. These factors include "[l]ength of the treatment relationship and the

frequency of examination," "[n]ature and extent of the treatment relationship," "'[s]upportability' in the form of the quality of the explanation provided for the medical opinion and the amount of relevant evidence— 'particularly medical signs and laboratory findings'—substantiating it," "'[c]onsistency,' meaning how consistent the medical opinion is with the record as a whole,'" and "'[s]pecialization,' favoring 'the medical opinion of a specialist about medical issues related to his or her area of specialty.'" *Id.* (citing 20 C.F.R. 404.1527(c)(2)(i), (ii), (3), (4), (5)). The ALJ should also consider "any other factors 'which tend to support or contradict the medical opinion.'" *Id.* (citing 20 C.F.R. § 404.1527(c)(6)).

Medical opinions may only be rendered by "acceptable medical sources," which the applicable regulations define as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a), SSR 06-3p, 2006 WL 2329939 at *1 (2006). "Other sources" are individuals other than acceptable medical sources that include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists, as well as non-medical sources. 20 C.F.R. § 404.1513(d); SSR 06-3p, 2006 WL 2329939 at *2 (2006). The factors in 20 C.F.R. § 404.1527(c) "explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources.'" SSR 06-3p, 2006 WL 2329939 at

*4 (2006). Nevertheless, these factors represent basic principles for the consideration of all opinion evidence. *Id.* "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case," and should be based on "consideration of the probative value of the opinions and a weighing of all evidence in that particular case." *Id.* at *5. "[D]epending on the particular case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.*

The ALJ provided a lengthy explanation to support his allocation of "little weight" to PA Smith's June 14, 2019 opinion. *See* Tr. at 25–26. He correctly noted that PA Smith was not "an acceptable medical source under the regulations." Tr. at 25. He cited "no evidence of acute cardiopulmonary disease, normal respiratory functioning, and generally musculoskeletal examinations within normal limits" as inconsistent with PA Smith's opinion. *Id.* He also considered the opinion to be inconsistent with the physical examinations, the record as a whole, Plaintiff's ADLs, and his work activity. Tr. at 25–26. He found PA Smith's opinion that Plaintiff's "symptoms constantly interfere with attention and concentration" to be inconsistent with treatment record that showed "normal attention, concentration and memory."

Tr. a 26. He indicated PA Smith's use of the term "rarely" in describing postural limitations was not in accordance with the terminology in the *DOT* and left room for speculation. *Id.* He stated the record did not support PA Smith's opinion as to side effects of medications. *Id.*

He also found PA Smith's opinion that Plaintiff was unable to maintain gainful employment was "not supported by the evidence" for "similar reasons." *Id.* He noted a finding of disability is an administrative decision reserved to the Commissioner. *Id.* He indicated PA Smith failed to provide a function-by-function assessment of Plaintiff's limitations. *Id.* He cited "stable angina symptoms and normal cardiovascular examinations," a "normal nuclear stress test," normal blood pressure readings, and normal cardiovascular and respiratory examinations." *Id.* He stated Plaintiff's work activity as a delivery driver was "inconsistent with class III–IV angina" and the activity reflected in the CDI investigation report did not support the opinion. Tr. at 26–27.

Although the ALJ was not required to explicitly consider all the factors in 20 C.F.R. § 404.1527(c), he appears to have ignored some of the relevant evidence in evaluating PA Smith's opinion. Many of the same errors the ALJ committed in assessing the RFC are also present in his evaluation of PA Smith's opinion. The ALJ cherrypicked evidence of nondisability and ignored objective findings and subjective allegations to the contrary. He concluded

there was no evidence of medication side effects and ignored the evidence that supported the side effects PA Smith identified. *See* Tr. at 3081, 3132, 3159, and 3251 (orthostatic hypotension and dizziness caused by Losartan and Coreg and headaches associated with use of nitroglycerin and isosorbide). He cited Plaintiff's work history and ADLs without explaining how activities like riding in and driving a car, visiting stores for brief periods, engaging in part-time work with limited physical demands, and sitting with and preparing medications for his mother were contrary to the limitations PA Smith included in his opinion.

In light of these errors, the court finds that the ALJ's evaluation of PA Smith's opinion does not reflect "consideration of the probative value of the opinions and a weighing of all evidence" in accordance with SSR 06-3p.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

January 26, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge